## UNITED STATES *v.* PINK, SUPERINTENDENT OF INSURANCE OF THE STATE OF NEW YORK, ET AL.

No. 42. Argued December 15, 1941.—Decided February 2, 1942.

204

*Solicitor General Fahy,* with whom *Assistant Attorney General Shea* and *Messrs. Melvin H. Siegel, Richard H. Demuth, Paul A. Sweeney,* and *Oscar H. Davis* were on the brief, for the United States.

208

*Mr. Alfred C. Bennett* for Louis H. Pink, Superintendent of Insurance of New York, respondent.

Briefs of *amici curiae* were filed by *Messrs. Paul C. Whipp* and *Lounsbury D. Bates,* for the Surviving Directors of First Russian Insurance Co.; by *Mr. Carl S. Stern* for Victor Yermaloff et al.; by *Mr. Borris M. Komar* for Brussendorf et al.; by *Mr. Albert G. Avery* for Frederick H. Cattley et al.; by *Messrs. Frederick H. Wood* and *Albert Ray Connelly* for certain receivers; and by *Mr. Samson Selig* for Andrew Ditmar et al., all urging affirmance.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

This action was brought by the United States to recover the assets of the New York branch of the First Russian Insurance Co. which remained in the hands of respondent after the payment of all domestic creditors. The material allegations of the complaint were, in brief, as follows:

The First Russian Insurance Co., organized under the laws of the former Empire of Russia, established a New York branch in 1907. It deposited with the Superintendent of Insurance, pursuant to the laws of New York, certain assets to secure payment of claims resulting from transactions of its New York branch. By certain laws, decrees, enactments and orders, in 1918 and 1919, the Russian Government nationalized the business of insurance and all of the property, wherever situated, of all Russian insurance companies (including the First Russian

Insurance Co.), and discharged and cancelled all the debts of such companies and the rights of all shareholders in all such property. The New York branch of the First Russian Insurance Co. continued to do business in New York until 1925. At that time, respondent, pursuant to an order of the Supreme Court of New York, took possession of its assets for a determination and report upon the claims of the policyholders and creditors in the United States. Thereafter, all claims of domestic creditors, *i.e.*, all claims arising out of the business of the New York branch, were paid by respondent, leaving a balance in his hands of more than $1,000,000. In 1931, the New York Court of Appeals (255 N. Y. 415, 175 N. E. 114) directed respondent to dispose of that balance as follows: first, to pay claims of foreign creditors who had filed attachment prior to the commencement of the liquidation proceeding, and also such claims as were filed prior to the entry of the order on remittitur of that court; and second, to pay any surplus to a quorum of the board of directors of the company. Pursuant to that mandate, respondent proceeded with the liquidation of the claims of the foreign creditors. Some payments were made thereon. The major portion of the allowed claims, however, were not paid, a stay having been granted pending disposition of the claim of the United States. On November 16, 1933, the United States recognized the Union of Soviet Socialist Republics as the *de jure* Government of Russia and as an incident to that recognition accepted an assignment (known as the Litvinov Assignment) of certain claims.[1] The Litvinov Assignment was in the form of a letter, dated November 16, 1933, to the President of the United States from Maxim Litvinov, People's Commissar for Foreign Affairs, reading as follows:

---

[1] See Establishment of Diplomatic Relations with the Union of Soviet Socialist Republics, Dept. of State, Eastern European Series, No. 1 (1933) for the various documents pertaining to recognition.

212

"Following our conversations I have the honor to inform you that the Government of the Union of Soviet Socialist Republics agrees that, preparatory to a final settlement of the claims and counter claims between the Governments of the Union of Soviet Socialist Republics and the United States of America and the claims of their nationals, the Government of the Union of Soviet Socialist Republics will not take any steps to enforce any decisions of courts or initiate any new litigations for the amounts admitted to be due or that may be found to be due it, as the successor of prior Governments of Russia, or otherwise, from American nationals, including corporations, companies, partnerships, or associations, and also the claim against the United States of the Russian Volunteer Fleet, now in litigation in the United States Court of Claims, and will not object to such amounts being assigned and does hereby release and assign all such amounts to the Government of the United States, the Government of the Union of Soviet Socialist Republics to be duly notified in each case of any amount realized by the Government of the United States from such release and assignment.

"The Government of the Union of Soviet Socialist Republics further agrees, preparatory to the settlement referred to above not to make any claims with respect to:

"(a) judgments rendered or that may be rendered by American courts in so far as they relate to property, or rights, or interests therein, in which the Union of Soviet Socialist Republics or its nationals may have had or may claim to have an interest; or,

"(b) acts done or settlements made by or with the Government of the United States, or public officials in the United States, or its nationals, relating to property, credits, or obligations of any Government of Russia or nationals thereof."

This was acknowledged by the President on the same date. The acknowledgment, after setting forth the terms of the assignment, concluded:

"I am glad to have these undertakings by your Government and I shall be pleased to notify your Government in each case of any amount realized by the Government of the United States from the release and assignment to it of the amounts admitted to be due, or that may be found to be due, the Government of the Union of Soviet Socialist Republics, and of the amount that may be found to be due on the claim of the Russian Volunteer Fleet."

On November 14, 1934, the United States brought an action in the federal District Court for the Southern District of New York, seeking to recover the assets in the hands of respondent. This Court held in *United States* v. *Bank of New York & Trust Co.*, 296 U. S. 463, that the well settled "principles governing the convenient and orderly administration of justice require that the jurisdiction of the state court should be respected" (p. 480); and that, whatever might be "the effect of recognition" of the Russian Government, it did not terminate the state proceedings. p. 479. The United States was remitted to the state court for determination of its claim, no opinion being intimated on the merits. p. 481. The United States then moved for leave to intervene in the liquidation proceedings. Its motion was denied "without prejudice to the institution of the time-honored form of action." That order was affirmed on appeal.

Thereafter, the present suit was instituted in the Supreme Court of New York. The defendants, other than respondent, were certain designated policyholders and other creditors who had presented in the liquidation proceedings claims against the corporation. The complaint prayed, *inter alia,* that the United States be adjudged to be the sole and exclusive owner entitled to immediate possession of the entire surplus fund in the hands of the respondent.

Respondent's answer denied the allegations of the complaint that title to the funds in question passed to the

United States and that the Russian decrees had the effect claimed. It also set forth various affirmative defenses— that the order of distribution pursuant to the decree in 255 N. Y. 415, 175 N. E. 114, could not be affected by the Litvinov Assignment; that the Litvinov Assignment was unenforceable because it was conditioned upon a final settlement of claims and counterclaims which had not been accomplished; that under Russian law the nationalization decrees in question had no effect on property not factually taken into possession by the Russian Government prior to May 22, 1922; that the Russian decrees had no extraterritorial effect, according to Russian law; that if the decrees were given extraterritorial effect, they were confiscatory and their recognition would be unconstitutional and contrary to the public policy of the United States and of the State of New York; and that the United States, under the Litvinov Assignment, acted merely as a collection agency for the Russian Government and hence was foreclosed from asserting any title to the property in question.

The answer was filed in March, 1938. In April, 1939, the New York Court of Appeals decided *Moscow Fire Ins. Co.* v. *Bank of New York & Trust Co.*, 280 N. Y. 286, 20 N. E. 2d 758. In May, 1939, respondent (but not the other defendants) moved, pursuant to Rule 113 of the Rules of the New York Civil Practice Act and § 476 of that Act, for an order dismissing the complaint and awarding summary judgment in favor of respondent "on the ground that there is no merit to the action and that it is insufficient in law." The affidavit in support of the motion stated that there was "no dispute as to the facts"; that the separate defenses to the complaint "need not now be considered for the complaint standing alone is insufficient in law"; that the facts in the *Moscow* case and the instant one, so far as material, were "parallel" and the Russian de-

crees the same; and that the *Moscow* case authoritatively settled the principles of law governing the instant one. The affidavit read in opposition to the motion stated that a petition for certiorari in the *Moscow* case was about to be filed in this Court; that the motion was premature and should be denied, or decision thereon withheld pending the final decision of this Court. On June 29, 1939, the Supreme Court of New York granted the motion and dismissed the complaint "on the merits," citing only the *Moscow* case in support of its action. On September 2, 1939, a petition for certiorari in the *Moscow* case was filed in this Court. The judgment in that case was affirmed here by an equally divided Court. 309 U. S. 624. Subsequently, the Appellate Division of the Supreme Court of New York affirmed, without opinion, the order of dismissal in the instant case. The Court of Appeals affirmed with a *per curiam* opinion (284 N. Y. 555, 32 N. E. 2d 552) which, after noting that the decision below was "in accord with the decision" in the *Moscow* case, stated:

"Three of the judges of this court concurred in a forceful opinion dissenting from the court's decision in that case, but the decision left open no question which has been argued upon this appeal. We are agreed that without again considering such questions this court should, in determining title to assets of First Russian Insurance Company, deposited in this State, apply in this case the same rules of law which the court applied in the earlier case in determining title to the assets of Moscow Fire Insurance Company deposited here."

We granted the petition for certiorari because of the nature and public importance of the questions raised.

*First.* Respondent insists that the complaint in this action was identical in substance and sought the same relief as the petition of the United States in the *Moscow* case, and that his answer set up the same defenses as were suc-

cessfully sustained against the United States by the defendants in that case. He also maintains that both parties agreed, on the motion for summary judgment, that the decision in the *Moscow* case governed this cause, leaving no issues to be tried. We agree with those contentions. It is in accord not only with the motion papers, but also with the ruling of the New York Court of Appeals that the *Moscow* case "left open no question which has been argued upon this appeal." In view of that ruling, we are not free to inquire, as petitioner suggests, into the propriety under New York practice of grounding the motion for summary judgment on the record in the *Moscow* case. That is distinctly a question of state law, on which New York has the last word.

But it does not follow, as respondent urges, that the writ should be dismissed as improvidently granted. The *Moscow* case is not *res judicata,* since respondent was not a party to that suit. *Stone* v. *Farmers' Bank of Kentucky,* 174 U. S. 409; *Rudd* v. *Cornell,* 171 N. Y. 114, 127–128, 63 N. E. 2d 823; *St. John* v. *Fowler,* 229 N. Y. 270, 274, 128 N. E. 199. Nor was our affirmance of the judgment in that case by an equally divided court an authoritative precedent. While it was conclusive and binding upon the parties as respects that controversy (*Durant* v. *Essex Company,* 7 Wall. 107), the lack of an agreement by a majority of the Court on the principles of law involved prevents it from being an authoritative determination for other cases. *Hertz* v. *Woodman,* 218 U. S. 205, 213–214.

The upshot of the matter is that we now reach the issues in the *Moscow* case insofar as they are embraced in the pleadings in this case. And there is no reason why we cannot take judicial notice of the record in this Court of the *Moscow* case. *Bienville Water Supply Co.* v. *Mobile,* 186 U. S. 212, 217; *Dimmick* v. *Tompkins,* 194 U. S. 540, 548; *Freshman* v. *Atkins,* 269 U. S. 121, 124.

*Second.* The New York Court of Appeals held in the *Moscow* case that the Russian decrees [2] in question had no extraterritorial effect. If that is true, it is decisive of the present controversy. For the United States acquired, under the Litvinov Assignment, only such rights as Russia had. *Guaranty Trust Co.* v. *United States,* 304 U. S. 126, 143. If the Russian decrees left the New York assets of the Russian insurance companies unaffected, then Russia had nothing here to assign. But that question of foreign law is not to be determined exclusively by the state court. The claim of the United States based on the Litvinov Assignment raises a federal question. *United States* v. *Belmont,* 301 U. S. 324. This Court will review or independently determine all questions on which a federal right is necessarily dependent. *United States* v. *Ansonia Brass &*

---

[2] The three decrees on which the United States placed primary emphasis (apart from the one set forth in note 3, *infra*) were described in the findings of the referee in the *Moscow* case as follows:

"88. The decree of November 18, 1919 on the annulment of life insurance contracts abolished insurance of life in all its forms in the Republic and annulled all contracts with insurance companies and savings banks with respect to the insurance of life, capital and income.

"89. The decree of the Soviet of People's Commissars dated March 4, 1919, on the liquidation of obligations of State enterprises, provided that stock certificates and shares of joint stock companies, whose enterprises have been either nationalized or sequestered, are annulled and also provided that such enterprises are free from the payment of all debts to private persons and enterprises which have arisen prior to the nationalization of these enterprises, including payments on bond loans with the exception only of wages due to workers and employees.

"90. The decree of the Soviet of People's Commissars dated June 28, 1918 provides in Article I that the commercial and industrial enterprises enumerated therein, which are located within the boundaries of the Soviet Republic, together with all their capital and property, regardless of what the latter may consist, are declared the property of the Republic."

*Copper Co.,* 218 U. S. 452, 462–463, 471; *Ancient Egyptian
Order* v. *Michaux,* 279 U. S. 737, 744–745; *Broad River
Power Co.* v. *South Carolina,* 281 U. S. 537, 540; *Pierre* v.
*Louisiana,* 306 U. S. 354, 358. Here, title obtained under
the Litvinov Assignment depends on a correct interpreta-
tion of Russian law. As in cases arising under the full faith
and credit clause (*Huntington* v. *Attrill,* 146 U. S. 657, 684;
*Adam* v. *Saenger,* 303 U. S. 59, 64), these questions of for-
eign law on which the asserted federal right is based are
not peculiarly within the cognizance of the local courts.
While deference will be given to the determination of the
state court, its conclusion is not accepted as final.

We do not stop to review all the evidence in the volumi-
nous record of the *Moscow* case bearing on the question of
the extraterritorial effect of the Russian decrees of na-
tionalization, except to note that the expert testimony
tendered by the United States gave great credence to its
position. Subsequently to the hearings in that case, how-
ever, the United States, through diplomatic channels, re-
quested the Commissariat for Foreign Affairs of the Rus-
sian Government to obtain an official declaration by the
Commissariat for Justice of the R. S. F. S. R. which would
make clear, as a matter of Russian law, the intended effect
of the Russian decree [3] nationalizing insurance companies

---

[3] Relevant portions of the Insurance Decree dated November 28,
1918, translated in accordance with the findings of the referee in the
*Moscow* case, are:

"603. On the organization of the insurance business in the Russian
Republic.

"(1) Insurance in all its forms, such as: fire insurance, insurance on
shipments, life insurance, accident insurance, hail insurance, livestock
insurance, insurance against failure of crops, etc. is hereby proclaimed
as a State monopoly.

"Note. Mutual insurance of movable goods and merchandise by
the cooperative organizations is conducted on a special basis.

"(2) All private insurance companies and organizations (stock
and share holding, also mutual) upon issuance of this decree are subject

upon the funds of such companies outside of Russia. The official declaration, dated November 28, 1937, reads as follows:

"The People's Commissariat for Justice of the R. S. F. S. R. certifies that by virtue of the laws of the organs of the Soviet Government all nationalized funds and property of

---

to liquidation; former rural* (People's Soviet) and municipal mutual insurance organizations operating within the boundaries of the Russian Republic are hereby proclaimed the property of the Russian Socialist Federated Soviet Republic.

"(3)  For the immediate organization of the insurance business and for the liquidation of parts of insurance institutions, which have become the property of the Russian Socialist Federated Soviet Republic, a Commission is established under the Supreme Soviet of National Economy, consisting of representatives of the Supreme Soviet of National Economy, the People's Commissariats of Commerce and Industry, Interior Affairs, the Commissar of Insurance and Fire Prevention, Finances, Labor, and State Control, and of Soviet Insurance Organizations (People's Soviet and Municipal Mutual).

"Note.  The same commission is charged with the liquidating of private insurance organizations, all property and assets of which, remaining on hand after their liquidation, shall become the property of the Russian Socialist Federated Soviet Republic.

"(4)  The above-mentioned reorganization and liquidation of existing insurance organizations and institutions shall be accomplished not later than the first day of April 1919.

.            .            .            .      .

"(8)  The present decree comes into force on the day of its publication."

---

* "zemskie."

The referee in the *Moscow* case found that, upon publication of this decree, all Russian insurance companies were prohibited from engaging in the insurance business in Russia; that they became subject to liquidation and were dissolved; that all of their assets in Russia became the property of the State; that, on publication of the decree, the directors of the companies lost all power to act as directors or conservators of the property, or to represent the companies in any way; and that the Russian Government became the statutory successor and domiciliary liquidator of companies whose property was nationalized.

former private enterprises and companies, in particular by virtue of the decree of November 28, 1918 (Collection of Laws of the R. S. F. S. R., 1918, No. 86, Article 904), the funds and property of former insurance companies, constitute the property of the State, irrespective of the nature of the property and irrespective of whether it was situated within the territorial limits of the R.S.F.S.R. or abroad."

The referee in the *Moscow* case found, and the evidence supported his finding, that the Commissariat for Justice has power to interpret existing Russian law. That being true, this official declaration is conclusive so far as the intended extraterritorial effect of the Russian decree is concerned. This official declaration was before the court below, though it was not a part of the record. It was tendered pursuant to § 391 of the New York Civil Practice Act, as amended by L. 1933, c. 690.[4] In New York, it would seem that foreign law must be found by the court (or in case of a jury trial, binding instructions must be

---

[4] That section reads:

"A printed copy of a statute, or other written law, of another state, or of a territory, or of a foreign country, or a printed copy of a proclamation, edict, decree or ordinance, by the executive power thereof, contained in a book or publication purporting or proved to have been published by the authority thereof, or proved to be commonly admitted as evidence of the existing law in the judicial tribunals thereof, is presumptive evidence of the statute, law, proclamation, edict, decree or ordinance. The unwritten or common law of another state, or of a territory, or of a foreign country, may be proved as a fact by oral evidence. The books of reports of cases adjudged in the courts thereof must also be admitted as presumptive evidence of the unwritten or common law thereof. The law of such state or territory or foreign country is to be determined by the court or referee and included in the findings of the court or referee or charged to the jury, as the case may be. Such finding or charge is subject to review on appeal. In determining such law, neither the trial court nor any appellate court shall be limited to the evidence produced on the trial by the parties, but may consult any of the written authorities above named in this section, with the same force and effect as if the same had been admitted in evidence."

given), though procedural considerations require it to be presented as a question of fact. *Fitzpatrick* v. *International Railway Co.,* 252 N. Y. 127, 169 N. E. 112; *Petrogradsky M. K. Bank* v. *National City Bank,* 253 N. Y. 23, 170 N. E. 479. And under § 391, as amended, it is clear that the New York appellate court has authority to consider appropriate decisions interpreting foreign law even though they are rendered subsequently to the trial. *Los Angeles Investment Securities Corp.* v. *Joslyn,* 282 N. Y. 438, 26 N. E. 2d 968. We can take such notice of the foreign law as the New York court could have taken.[5] *Adam* v. *Saenger, supra.* We conclude that this official declaration of Russian law was not only properly before the court on appeal, but also that it was embraced within those "written authorities" which § 391 authorizes the court to consider, even though not introduced in evidence on the trial. For, while it was not "printed," it would seem to be "other written law" of unquestioned authenticity and authority, within the meaning of § 391.

We hold that, so far as its intended effect[6] is concerned, the Russian decree embraced the New York assets of the First Russian Insurance Co.

*Third.* The question of whether the decree should be given extraterritorial effect is, of course, a distinct matter. One primary issue raised in that connection is whether, under our constitutional system, New York law can be allowed to stand in the way.

The decision of the New York Court of Appeals in the *Moscow* case is unequivocal. It held that "under the law of this State such confiscatory decrees do not affect the property claimed here" (280 N. Y. 314, 20 N. E. 2d 769);

---

[5] Hence, the denial of the motion of the United States to certify the official declaration as part of the record of the *Moscow* case in this Court (281 N. Y. 818, 24 N. E. 2d 487) would seem immaterial to our right to consult it.

[6] See also note 7, *infra.*

that the property of the New York branch acquired a "character of its own" which was "dependent" on the law of New York (p. 310); that no "rule of comity and no act of the United States government constrains this State to abandon any part of its control or to share it with a foreign State" (p. 310); that, although the Russian decree effected the death of the parent company, the situs of the property of the New York branch was in New York; and that no principle of law forces New York to forsake the method of distribution authorized in the earlier appeal (255 N. Y. 415, 175 N. E. 114) and to hold that "the method which in 1931 conformed to the exactions of justice and equity must be rejected because retroactively it has become unlawful" (p. 312).

It is one thing to hold, as was done in *Guaranty Trust Co.* v. *United States, supra,* 304 U. S. at p. 142, that under the Litvinov Assignment the United States did not acquire "a right free of a preëxisting infirmity," such as the running of the statute of limitations against the Russian Government, its assignor. Unlike the problem presented here and in the *Moscow* case, that holding in no way sanctions the asserted power of New York to deny enforcement of a claim under the Litvinov Assignment because of an overriding policy of the State which denies validity in New York of the Russian decrees on which the assigned claims rest. That power was denied New York in *United States* v. *Belmont, supra,* 301 U. S. 324. With one qualification, to be noted, the *Belmont* case is determinative of the present controversy.

That case involved the right of the United States under the Litvinov Assignment to recover, from a custodian or stakeholder in New York, funds which had been nationalized and appropriated by the Russian decrees.

This Court, speaking through Mr. Justice Sutherland, held that the conduct of foreign relations is committed by the Constitution to the political departments of the Fed-

eral Government; that the propriety of the exercise of that power is not open to judicial inquiry; and that recognition of a foreign sovereign conclusively binds the courts and "is retroactive and validates all actions and conduct of the government so recognized from the commencement of its existence." 301 U. S. at p. 328. It further held (p. 330) that recognition of the Soviet Government, the establishment of diplomatic relations with it, and the Litvinov Assignment were "all parts of one transaction, resulting in an international compact between the two governments." After stating that, "in respect of what was done here, the Executive had authority to speak as the sole organ" of the national government, it added (p. 330): "The assignment and the agreements in connection therewith did not, as in the case of treaties, as that term is used in the treaty making clause of the Constitution (Art. II, § 2), require the advice and consent of the Senate." It held (p. 331) that the "external powers of the United States are to be exercised without regard to state laws or policies. The supremacy of a treaty in this respect has been recognized from the beginning." And it added that "all international compacts and agreements" are to be treated with similar dignity for the reason that "complete power over international affairs is in the national government and is not and cannot be subject to any curtailment or interference on the part of the several states." p. 331. This Court did not stop to inquire whether in fact there was any policy of New York which enforcement of the Litvinov Assignment would infringe since "no state policy can prevail against the international compact here involved." p. 327.

The New York Court of Appeals, in the *Moscow* case (280 N. Y. 309, 20 N. E. 2d 758), distinguished the *Belmont* case on the ground that it was decided on the sufficiency of the pleadings, the demurrer to the complaint admitting that under the Russian decree the property was confiscated by the Russian Government and then trans-

224

ferred to the United States under the Litvinov Assignment. But, as we have seen, the Russian decree in question was intended to have an extraterritorial effect and to embrace funds of the kind which are here involved. Nor can there be any serious doubt that claims of the kind here in question were included in the Litvinov Assignment.[7] It is broad and inclusive. It should be inter-

[7] A clarification of the Litvinov Assignment was made in an exchange of letters between the American Charge d'Affaires and the People's Commissar for Foreign Affairs on January 7, 1937. The letter of the former read:

"I have the honor to inform you that it is the understanding of the Government of the United States that the Government of the Union of Soviet Socialist Republics considers that by and upon the formation of the Union of Soviet Socialist Republics and the adoption of the Constitution of 1923 of the Union of Soviet Socialist Republics, the Union of Soviet Socialist Republics acquired the right to dispose of the property, rights, or interests therein located abroad of all corporations and companies which had theretofore been nationalized by decrees of the constituent republics or their predecessors.

"The Government of the United States further understands that it was the purpose and intention of the Government of the Union of Soviet Socialist Republics to assign to the Government of the United States, among other amounts, all the amounts admitted to be due or that may be found to be due not only the Union of Soviet Socialist Republics but also the constituent republics of the Union of Soviet Socialist Republics or their predecessors from American nationals, including corporations, companies, partnerships, or associations, and also the claim against the United States of the Russian Volunteer Fleet, in litigation in the United States Court of Claims, and that the Government of the Union of Soviet Socialist Republics did release and assign all such amounts to the Government of the United States by virtue of the note addressed by you to the President of the United States on November 16, 1933.

"Will you be good enough to confirm the understanding which the Government of the United States has in this matter, concerning the law of the Russian Socialist Federated Soviet Republic, the Constitution and laws of the Union of Soviet Socialist Republics, and the intention and purpose of the Government of the Union of Soviet Socialist Republics in the above-mentioned assignment?"

preted consonantly with the purpose of the compact to eliminate all possible sources of friction between these two great nations. See *Tucker* v. *Alexandroff*, 183 U. S. 424, 437; *Jordan* v. *Tashiro*, 278 U. S. 123, 127. Strict construction would run counter to that national policy. For, as we shall see, the existence of unpaid claims against Russia and its nationals, which were held in this country, and which the Litvinov Assignment was intended to secure, had long been one impediment to resumption of friendly relations between these two great powers.

The reply of the People's Commissar for Foreign Affairs was:

"In reply to your note of January 7, 1937, I have the honor to inform you that the Government of the Union of Soviet Socialist Republics considers that by and upon the formation of the Union of Soviet Socialist Republics and the adoption of the Constitution of 1923 of the Union of Soviet Socialist Republics, the Union of Soviet Socialist Republics acquired the right to dispose of the property, rights, or interests therein located abroad of all corporations and companies which had theretofore been nationalized by decrees of the constituent republics or their predecessors.

"You are further informed that it was the purpose and intention of the Government of the Union of Soviet Socialist Republics to assign to the Government of the United States, among other amounts, all the amounts admitted to be due or that may be found to be due not only the Union of Soviet Socialist Republics but also the constituent republics of the Union of Soviet Socialist Republics or their predecessors from American nationals, including corporations, companies, partnerships, or associations, and also the claim against the United States of the Russian Volunteer Fleet, in litigation in the United States Court of Claims, and that the Government of the Union of Soviet Socialist Republics did release and assign all such amounts to the Government of the United States by virtue of the note addressed by me to the President of the United States on November 16, 1933.

"I have the honor, therefore, to confirm the understanding, as expressed in your note of January 7, 1937, which the Government of the United States has in this matter, concerning the law of the Russian Socialist Federated Soviet Republic, the Constitution and laws of the Union of Soviet Socialist Republics, and the intention and purpose of the Government of the Union of Soviet Socialist Republics in the above-mentioned assignment."

The holding in the *Belmont* case is therefore determinative of the present controversy, unless the stake of the foreign creditors in this liquidation proceeding and the provision which New York has provided for their protection call for a different result.

*Fourth.* The *Belmont* case forecloses any relief to the Russian corporation. For this Court held in that case (301 U. S. at p. 332): ". . . our Constitution, laws and policies have no extraterritorial operation, unless in respect of our own citizens. . . . What another country has done in the way of taking over property of its nationals, and especially of its corporations, is not a matter for judicial consideration here. Such nationals must look to their own government for any redress to which they may be entitled."

But it is urged that different considerations apply in case of the foreign creditors [8] to whom the New York Court of Appeals (255 N. Y. 415, 175 N. E. 114) ordered distribution of these funds. The argument is that their rights in these funds have vested by virtue of the New York decree; that to deprive them of the property would violate the Fifth Amendment which extends its protection to aliens as well as to citizens; and that the Litvinov Assignment cannot deprive New York of its power to administer the balance of the fund in accordance with its laws for the benefit of these creditors.

At the outset, it should be noted that, so far as appears, all creditors whose claims arose out of dealings with the New York branch have been paid. Thus we are not faced with the question whether New York's policy of protecting

---

[8] In view of the disposition which we make of this case, we express no view on whether these creditors would be barred from asserting their claims here by virtue of the ruling in *Canada Southern Ry. Co.* v. *Gebhard*, 109 U. S. 527, 538, that "anything done at the legal home of the corporation, under the authority of such laws, which discharges it from liability there, discharges it everywhere."

the so-called local creditors by giving them priority in the assets deposited with the State (*Matter of People*, 242 N. Y. 148, 158–159, 151 N. E. 159) should be recognized within the rule of *Clark* v. *Williard*, 294 U. S. 211, or should yield to the Federal policy expressed in the international compact or agreement. *Santovincenzo* v. *Egan*, 284 U. S. 30, 40; *United States* v. *Belmont, supra.* We intimate no opinion on that question. The contest here is between the United States and creditors of the Russian corporation who, we assume, are not citizens of this country and whose claims did not arise out of transactions with the New York branch. The United States is seeking to protect not only claims which it holds but also claims of its nationals. H. Rep. No. 865, 76th Cong., 1st Sess. Such claims did not arise out of transactions with this Russian corporation; they are, however, claims against Russia or its nationals. The existence of such claims and their non-payment had for years been one of the barriers to recognition of the Soviet regime by the Executive Department. Graham, Russian-American Relations, 1917–1933: An Interpretation, 28 Am. Pol. Sc. Rev. 387; 1 Hackworth, Digest of International Law (1940), pp. 302–304. The purpose of the discussions leading to the policy of recognition was to resolve "all questions outstanding" between the two nations. Establishment of Diplomatic Relations with the Union of Soviet Socialist Republics, Dept. of State, Eastern European Series, No. 1 (1933), p. 1. Settlement of all American claims against Russia was one method of removing some of the prior objections to recognition based on the Soviet policy of nationalization. The Litvinov Assignment was not only part and parcel of the new policy of recognition (*id.*, p. 13), it was also the method adopted by the Executive Department for alleviating in this country the rigors of nationalization. Congress tacitly recognized that policy. Acting in anticipation of the realization of funds under the Litvinov

Assignment (H. Rep. No. 865, 76th Cong., 1st Sess.), it authorized the appointment of a Commissioner to determine the claims of American nationals against the Soviet Government. Joint Resolution of August 4, 1939, 53 Stat. 1199.

If the President had the power to determine the policy which was to govern the question of recognition, then the Fifth Amendment does not stand in the way of giving full force and effect to the Litvinov Assignment. To be sure, aliens as well as citizens are entitled to the protection of the Fifth Amendment. *Russian Volunteer Fleet* v. *United States,* 282 U. S. 481. A State is not precluded, however, by the Fourteenth Amendment from according priority to local creditors as against creditors who are nationals of foreign countries and whose claims arose abroad. *Disconto Gesellschaft* v. *Umbreit,* 208 U. S. 570. By the same token, the Federal Government is not barred by the Fifth Amendment from securing for itself and our nationals priority against such creditors. And it matters not that the procedure adopted by the Federal Government is globular and involves a regrouping of assets. There is no Constitutional reason why this Government need act as the collection agent for nationals of other countries when it takes steps to protect itself or its own nationals on external debts. There is no reason why it may not, through such devices as the Litvinov Assignment, make itself and its nationals whole from assets here before it permits such assets to go abroad in satisfaction of claims of aliens made elsewhere and not incurred in connection with business conducted in this country. The fact that New York has marshaled the claims of the foreign creditors here involved and authorized their payment does not give them immunity from that general rule.

If the priority had been accorded American claims by treaty with Russia, there would be no doubt as to its validity. Cf. *Santovincenzo* v. *Egan, supra.* The same result

obtains here. The powers of the President in the conduct of foreign relations included the power, without consent of the Senate, to determine the public policy of the United States with respect to the Russian nationalization decrees. "What government is to be regarded here as representative of a foreign sovereign state is a political rather than a judicial question, and is to be determined by the political department of the government." *Guaranty Trust Co.* v. *United States, supra,* 304 U. S. at p. 137. That authority is not limited to a determination of the government to be recognized. It includes the power to determine the policy which is to govern the question of recognition. Objections to the underlying policy as well as objections to recognition are to be addressed to the political department and not to the courts. See *Guaranty Trust Co.* v. *United States, supra,* p. 138; *Kennett* v. *Chambers,* 14 How. 38, 50–51. As we have noted, this Court in the *Belmont* case recognized that the Litvinov Assignment was an international compact which did not require the participation of the Senate. It stated (301 U. S. pp. 330–331): "There are many such compacts, of which a protocol, a modus vivendi, a postal convention, and agreements like that now under consideration are illustrations." And see *Monaco* v. *Mississippi,* 292 U. S. 313, 331; *United States* v. *Curtiss-Wright Corp.,* 299 U. S. 304, 318. Recognition is not always absolute; it is sometimes conditional. 1 Moore, International Law Digest (1906), pp. 73–74; 1 Hackworth, Digest of International Law (1940), pp. 192–195. Power to remove such obstacles to full recognition as settlement of claims of our nationals (Levitan, Executive Agreements, 35 Ill. L. Rev. 365, 382–385) certainly is a modest implied power of the President who is the "sole organ of the federal government in the field of international relations." *United States* v. *Curtiss-Wright Corp., supra,* p. 320. Effectiveness in handling the delicate problems of foreign relations requires no less. Unless

such a power exists, the power of recognition might be thwarted or seriously diluted. No such obstacle can be placed in the way of rehabilitation of relations between this country and another nation, unless the historic conception of the powers and responsibilities of the President in the conduct of foreign affairs (see Moore, Treaties and Executive Agreements, 20 Pol. Sc. Q. 385, 403–417) is to be drastically revised. It was the judgment of the political department that full recognition of the Soviet Government required the settlement of all outstanding problems including the claims of our nationals. Recognition and the Litvinov Assignment were interdependent. We would usurp the executive function if we held that that decision was not final and conclusive in the courts.

"All constitutional acts of power, whether in the executive or in the judicial department, have as much legal validity and obligation as if they proceeded from the legislature, . . ." The Federalist, No. 64. A treaty is a "Law of the Land" under the supremacy clause (Art. VI, Cl. 2) of the Constitution. Such international compacts and agreements as the Litvinov Assignment have a similar dignity. *United States* v. *Belmont, supra,* 301 U. S. at p. 331. See Corwin, The President, Office & Powers (1940), pp. 228–240.

It is, of course, true that even treaties with foreign nations will be carefully construed so as not to derogate from the authority and jurisdiction of the States of this nation unless clearly necessary to effectuate the national policy. *Guaranty Trust Co.* v. *United States, supra,* p. 143 and cases cited. For example, in *Todok* v. *Union State Bank,* 281 U. S. 449, this Court took pains in its construction of a treaty, relating to the power of an alien to dispose of property in this country, not to invalidate the provisions of state law governing such dispositions. Frequently the obligation of a treaty will be dependent on state law. *Prevost* v. *Greneaux,* 19 How. 1. But state

law must yield when it is inconsistent with, or impairs the policy or provisions of, a treaty or of an international compact or agreement. See *Nielsen* v. *Johnson*, 279 U. S. 47. Then, the power of a State to refuse enforcement of rights based on foreign law which runs counter to the public policy of the forum (*Griffin* v. *McCoach*, 313 U. S. 498, 506) must give way before the superior Federal policy evidenced by a treaty or international compact or agreement. *Santovincenzo* v. *Egan, supra,* 284 U. S. 30; *United States* v. *Belmont, supra.*

Enforcement of New York's policy as formulated by the *Moscow* case would collide with and subtract from the Federal policy, whether it was premised on the absence of extraterritorial effect of the Russian decrees, the conception of the New York branch as a distinct juristic personality, or disapproval by New York of the Russian program of nationalization.[9] For the *Moscow* case refuses to give effect or recognition in New York to acts of the Soviet Government which the United States by its policy of recognition agreed no longer to question. Enforcement of such state policies would indeed tend to restore some of the precise impediments to friendly relations which the President intended to remove on inauguration of the policy of recognition of the Soviet Government. In the

[9] In this connection it should be noted that § 977(b) of the New York Civil Practice Act provides for the appointment of a receiver to liquidate local assets of a foreign corporation where, *inter alia,* it has been dissolved, liquidated, or nationalized. Subdivision 19 of that section provides in part:

" . . . such liquidation, dissolution, nationalization, expiration of its existence, or repeal, suspension, revocation or annulment of its charter or organic law in the country of its domicile, or any confiscatory law or decree thereof, shall not be deemed to have any extra-territorial effect or validity as to the property, tangible or intangible, debts, demands or choses in action of such corporation within the state or any debts or obligations owing to such corporation from persons, firms or corporations residing, sojourning or doing business in the state."

first place, such action by New York, no matter what gloss be given it, amounts to official disapproval or non-recognition of the nationalization program of the Soviet Government. That disapproval or non-recognition is in the face of a disavowal by the United States of any official concern with that program. It is in the face of the underlying policy adopted by the United States when it recognized the Soviet Government. In the second place, to the extent that the action of the State in refusing enforcement of the Litvinov Assignment results in reduction or non-payment of claims of our nationals, it helps keep alive one source of friction which the policy of recognition intended to remove. Thus the action of New York tends to restore some of the precise irritants which had long affected the relations between these two great nations and which the policy of recognition was designed to eliminate.

We recently stated in *Hines* v. *Davidowitz,* 312 U. S. 52, 68, that the field which affects international relations is "the one aspect of our government that from the first has been most generally conceded imperatively to demand broad national authority"; and that any state power which may exist "is restricted to the narrowest of limits." There, we were dealing with the question as to whether a state statute regulating aliens survived a similar federal statute. We held that it did not. Here, we are dealing with an exclusive federal function. If state laws and policies did not yield before the exercise of the external powers of the United States, then our foreign policy might be thwarted. These are delicate matters. If state action could defeat or alter our foreign policy, serious consequences might ensue. The nation as a whole would be held to answer if a State created difficulties with a foreign power. Cf. *Chy Lung* v. *Freeman,* 92 U. S. 275, 279–280. Certainly, the conditions for "enduring friendship" between the nations, which the policy of recognition in this instance was de-

signed to effectuate,[10] are not likely to flourish where, contrary to national policy, a lingering atmosphere of hostility is created by state action.

Such considerations underlie the principle of *Oetjen* v. *Central Leather Co.*, 246 U. S. 297, 302–303, that when a revolutionary government is recognized as a *de jure* government, "such recognition is retroactive in effect and validates all the actions and conduct of the government so recognized from the commencement of its existence." They also explain the rule expressed in *Underhill* v. *Hernandez*, 168 U. S. 250, 252, that "the courts of one country will not sit in judgment on the acts of the government of another done within its own territory."

The action of New York in this case amounts in substance to a rejection of a part of the policy underlying recognition by this nation of Soviet Russia. Such power is not accorded a State in our constitutional system. To permit it would be to sanction a dangerous invasion of Federal authority. For it would "imperil the amicable relations between governments and vex the peace of nations." *Oetjen* v. *Central Leather Co., supra,* p. 304. It would tend to disturb that equilibrium in our foreign relations which the political departments of our national government had diligently endeavored to establish.

We repeat that there are limitations on the sovereignty of the States. No State can rewrite our foreign policy to conform to its own domestic policies. Power over external affairs is not shared by the States; it is vested in the national government exclusively. It need not be so exercised as to conform to state laws or state policies, whether they be expressed in constitutions, statutes, or judicial decrees. And the policies of the States become wholly irrelevant to judicial inquiry when the United States, act-

---

[10] Establishment of Diplomatic Relations with the Union of Soviet Socialist Republics, *supra* note 1, p. 20.

ing within its constitutional sphere, seeks enforcement of its foreign policy in the courts. For such reasons, Mr. Justice Sutherland stated in *United States* v. *Belmont, supra,* 301 U. S. at p. 331, "In respect of all international negotiations and compacts, and in respect of our foreign relations generally, state lines disappear. As to such purposes the State of New York does not exist."

We hold that the right to the funds or property in question became vested in the Soviet Government as the successor to the First Russian Insurance Co.; that this right has passed to the United States under the Litvinov Assignment; and that the United States is entitled to the property as against the corporation and the foreign creditors.

The judgment is reversed and the cause is remanded to the Supreme Court of New York for proceedings not inconsistent with this opinion.

*Reversed.*

MR. JUSTICE REED and MR. JUSTICE JACKSON did not participate in the consideration or decision of this case.

MR. JUSTICE FRANKFURTER:

The nature of the controversy makes it appropriate to add a few observations to my Brother DOUGLAS' opinion.

Legal ideas, like other organisms, cannot survive severance from their congenial environment. Concepts like "situs" and "jurisdiction" and "comity" summarize views evolved by the judicial process, in the absence of controlling legislation, for the settlement of domestic issues. To utilize such concepts for the solution of controversies international in nature, even though they are presented to the courts in the form of a private litigation, is to invoke a narrow and inadmissible frame of reference.

The expropriation decrees of the U. S. S. R. gave rise to extensive litigation among various classes of claimants to

funds belonging to Russian companies doing business or keeping accounts abroad. England and New York were the most active centers of this litigation. The opinions in the many cases before their courts constitute a sizeable library. They all derive from a single theme—the effect of the Russian expropriation decrees upon particular claims, in some cases before and in some cases after recognition of the U. S. S. R., either *de jure* or *de facto*. One cannot read this body of judicial opinions, in the Divisional Court, the Court of Appeal and the House of Lords, in the New York Supreme Court, the Appellate Division, and the Court of Appeals, and not be left with the conviction that they are the product largely of casuistry, confusion, and indecision. See Jaffee, Judicial Aspects of Foreign Relations, *passim*. The difficulties were inherent in the problems that confronted the courts. They were due to what Chief Judge Cardozo called "the hazards and embarrassments growing out of the confiscatory decrees of the Russian Soviet Republic," *Matter of People (Russian Reinsurance Co.)*, 255 N. Y. 415, 420, 175 N. E. 114, 115, and to the endeavor to adjust these "hazards and embarrassments" to "the largest considerations of public policy and justice," *James & Co.* v. *Second Russian Insurance Co.*, 239 N. Y. 248, 256, 146 N. E. 369, 370, when private claims to funds covered by the expropriation decrees were before the courts, particularly at a time when non-recognition was our national policy.

The opinions show both the English and the New York courts struggling to deal with these business consequences of major international complications through the application of traditional judicial concepts. "Situs," "jurisdiction," "comity," "domestication" and "dissolution" of corporations, and other legal ideas that often enough in litigation of a purely domestic nature prove their limitations as instruments for solution or even as means for analysis, were pressed into service for adjudicating claims

whose international implications could not be sterilized. This accounts for the divergence of views among the judges and for such contradictory and confusing rulings as the series of New York cases, from *Wulfsohn* v. *Russian Republic*, 234 N. Y. 372, 138 N. E. 24, to the ruling now under review, *Moscow Fire Ins. Co.* v. *Bank of New York & Trust Co.*, 280 N. Y. 286, 20 N. E. 2d 758, accounts for *Russian Commercial & Industrial Bank* v. *Comptoir d'Escompte de Mulhouse*, [1925] A. C. 112, compared with *Lazard Brothers & Co.* v. *Midland Bank*, [1933] A. C. 289, and for the fantastic result of the decision in *Lehigh Valley R. Co.* v. *State of Russia*, 21 F. 2d 396, in which the Kerensky régime was, in accordance with diplomatic determination, treated as the existing Russian government a decade after its extinction.

Courts could hardly escape perplexities when citizens asserted claims to Russian funds within the control of the forum. But a totally different situation was presented when all claims of local creditors were satisfied and only the conflicting claims of Russia and of former Russian creditors were involved. In the particular circumstances of Russian insurance companies doing business in New York, the State Superintendent of Insurance took possession of the assets of the Russian branches in New York to conserve them for the benefit of those entitled to them. Liquidation followed, domestic creditors and policy holders were paid, and the Superintendent found a large surplus on his hands. As statutory liquidator, the Superintendent of Insurance took the ground that "in view of the hazards and uncertainties of the Russian situation, the surplus should not be paid to any one, but should be left in his hands indefinitely, until a government recognized by the United States shall function in the territory of what was once the Russian Empire." 255 N. Y. 415, 421, 175 N. E. 114, 115. So the Appellate Division decreed. 229 App. Div. 637, 243 N. Y. S. 35. But the Court of Appeals

reversed and the scramble among the foreign claimants was allowed to proceed. 255 N. Y. 415, 175 N. E. 114. The Court of Appeals held that the retention of the surplus funds in the custody of the Superintendent of Insurance until the international relations between the United States and Russia had been formalized "did not solve the problem. It adjourned it *sine die.*" But adjournment, it may be suggested, is sometimes a constructive interim solution to avoid a temporizing and premature measure giving rise to new difficulties. Such I believe to have been the mischief that was bound to follow the rejection of the Superintendent's policy of conservation of the surplus Russian funds until recognition. Their disposition was inescapably entangled in recognition.

In the immediate case the United States sues, in effect, as the assignee of the Russian government for claims by that government against the Russian Insurance Company for monies in deposit in New York to which no American citizen makes claim. No manner of speech can change the central fact that here are monies which belonged to a Russian company and for which the Russian government has decreed payment to itself.

And so the question is whether New York can bar Russia from realizing on its decrees against these funds in New York after formal recognition by the United States of Russia and in light of the circumstances that led up to recognition and the exchange of notes that attended it. For New York to deny the effectiveness of these Russian decrees under such circumstances would be to oppose, at least in some respects, its notions as to the effect which should be accorded recognition as against that entertained by the national authority for conducting our foreign affairs. And the result is the same whether New York accomplishes it because its courts invoke judicial views regarding the enforcement of foreign expropriation decrees, or regarding the survival in New York of a Russian

business which according to Russian law had ceased to exist, or regarding the power of New York courts over funds of Russian companies owing from New York creditors. If this Court is not bound by the construction which the New York Court of Appeals places upon complicated transactions in New York in determining whether they come within the protection of the Constitution against impairing the obligations of contract, we certainly should not be bound by that court's construction of transactions so entangled in international significance as the status of New York branches of Russian companies and the disposition of their assets. Compare *Appleby* v. *City of New York,* 271 U. S. 364 and *Irving Trust Co.* v. *Day,* 314 U. S. 556. When the decision of a question of fact or of local law is so interwoven with the decision of a question of national authority that the one necessarily involves the other, we are not foreclosed by the state court's determination of the facts or of the local law. Otherwise, national authority could be frustrated by local rulings. See *Creswill* v. *Knights of Pythias,* 225 U. S. 246; *Davis* v. *Wechsler,* 263 U. S. 22.

It is not consonant with the sturdy conduct of our foreign relations that the effect of Russian decrees upon Russian funds in this country should depend on such gossamer distinctions as those by which courts have determined that Russian branches survive the death of their Russian origin. When courts deal with such essentially political phenomena as the taking over of Russian businesses by the Russian government by resorting to the forms and phrases of conventional corporation law, they inevitably fall into a dialectic quagmire. With commendable candor, the House of Lords frankly confessed as much when it practically overruled *Russian Commercial & Industrial Bank* v. *Comptoir d'Escompte de Mulhouse, supra,* saying through Lord Wright, "the whole matter has now to be reconsidered in the light of new evidence and of the historical evolution

of ten years." *Lazard Brothers & Co.* v. *Midland Bank,* [1933] A. C. 289, 300.

For we are not dealing here with physical property—whether chattels or realty. We are dealing with intangible rights, with choses in action. The fact that these claims were reduced to money does not change the character of the claims, and certainly is too tenuous a thread on which to determine issues affecting the relation between nations. Corporeal property may give rise to rules of law which, we have held, even in purely domestic controversies ought not to be transferred to the adjudication of impalpable claims such as are here in controversy. *Curry* v. *McCanless,* 307 U. S. 357, 363 *et seq.*

As between the states, due regard for their respective governmental acts is written into the Constitution by the Full Faith and Credit Clause (Art. IV, § 1). But the scope of its operation—when may the policy of one state deny the consequences of a transaction authorized by the laws of another—has given rise to a long history of judicial subtleties which hardly commend themselves for transfer to the solution of analogous problems between friendly nations. See *Huntington* v. *Attrill,* 146 U. S. 657; *Finney* v. *Guy,* 189 U. S. 335; *Milwaukee County* v. *White Co.,* 296 U. S. 268; *Pacific Ins. Co.* v. *Industrial Comm'n,* 306 U. S. 493, 502; *Pink* v. *A. A. A. Highway Express,* 314 U. S. 201.

For more than fifteen years, formal relations between the United States and Russia were broken because of serious differences between the two countries regarding the consequences to us of two major Russian policies. This complicated process of friction, abstention from friendly relations, efforts at accommodation, and negotiations for removing the causes of friction, are summarized by the delusively simple concept of "non-recognition." The history of Russo-American relations leaves no room for doubt that the two underlying sources of difficulty were

Russian propaganda and expropriation. Had any state court during this period given comfort to the Russian views in this contest between its government and ours, it would, to that extent, have interfered with the conduct of our foreign relations by the Executive, even if it had purported to do so under the guise of enforcing state law in a matter of local policy. On the contrary, during this period of non-recognition New York denied Russia access to her courts and did so on the single and conclusive ground: "We should do nothing to thwart the policy which the United States has adopted." *Russian Republic v. Cibrario*, 235 N. Y. 255, 263, 139 N. E. 259, 262. Similarly, no invocation of a local rule governing "situs" or the survival of a domesticated corporation, however applicable in an ordinary case, is within the competence of a state court if it would thwart to any extent "the policy which the United States has adopted" when the President reëstablished friendly relations in 1933.

And it would be thwarted if the judgment below were allowed to stand.

That the President's control of foreign relations includes the settlement of claims is indisputable. Thus, referring to the adhesion of the United States to the Dawes Plan, Secretary of State Hughes reported that "this agreement was negotiated under the long-recognized authority of the President to arrange for the payment of claims in favor of the United States and its nationals. The exercise of this authority has many illustrations, one of which is the Agreement of 1901 for the so-called Boxer Indemnity." (Secretary Hughes to President Coolidge, February 3, 1925, MS., Department of State, quoted in 5 Hackworth, Digest of Int. Law, c. 16, § 514.) The President's power to negotiate such a settlement is the same whether it is an isolated transaction between this country and a friendly nation, or is part of a complicated negotiation to restore normal relations, as was the case with Russia.

That the power to establish such normal relations with a foreign country belongs to the President is equally indisputable. Recognition of a foreign country is not a theoretical problem or an exercise in abstract symbolism. It is the assertion of national power directed towards safeguarding and promoting our interests and those of civilization. Recognition of a revolutionary government normally involves the removal of areas of friction. As often as not, areas of friction are removed by the adjustment of claims pressed by this country on behalf of its nationals against a new régime.

Such a settlement was made by the President when this country resumed normal relations with Russia. The two chief barriers to renewed friendship with Russia—intrusive propaganda and the effects of expropriation decrees upon our nationals—were at the core of our negotiations in 1933, as they had been for a good many years. The exchanges between the President and M. Litvinov must be read not in isolation but as the culmination of difficulties and dealings extending over fifteen years. And they must be read not as self-contained technical documents, like a marine insurance contract or a bill of lading, but as characteristically delicate and elusive expressions of diplomacy. The draftsmen of such notes must save sensibilities and avoid the explicitness on which diplomatic negotiations so easily founder.

The controlling history of the Soviet régime and of this country's relations with it must be read between the lines of the Roosevelt-Litvinov Agreement. One needs to be no expert in Russian law to know that the expropriation decrees intended to sweep the assets of Russian companies taken over by that government into Russia's control no matter where those assets were credited. Equally clear is it that the assignment by Russia meant to give the United States, as part of the comprehensive settlement, everything that Russia claimed under its laws against

Russians. It does violence to the course of negotiations between the United States and Russia, and to the scope of the final adjustment, to assume that a settlement thus made on behalf of the United States—to settle both money claims and to soothe feelings—was to be qualified by the variant notions of the courts of the forty-eight states regarding "situs" or "jurisdiction" over intangibles or the survival of extinct Russian corporations. In our dealings with the outside world, the United States speaks with one voice and acts as one, unembarrassed by the complications as to domestic issues which are inherent in the distribution of political power between the national government and the individual states.

MR. CHIEF JUSTICE STONE, dissenting:

I think the judgment should be affirmed.

As my brethren are content to rest their decision on the authority of the dictum in *United States* v. *Belmont,* 301 U. S. 324, without the aid of any pertinent decision of this Court, I think a word should be said of the authority and reasoning of the *Belmont* case and of the principles which I think are controlling here.

In the *Belmont* case, the United States brought suit in the federal court to recover a debt alleged to be due upon a deposit account of a Russian national with a New York banker. The complaint set up the confiscation of the account by decrees of the Soviet Government and the transfer of the debt to the United States by the Litvinov assignment, concurrently with our diplomatic recognition of that Government. It was not alleged, nor did it appear, that the New York courts had, subsequent to recognition, refused to give effect to the Soviet decrees as operating to transfer the title of Russian nationals to property located in New York. No such national or any adverse claimant was a party to the suit. In sustaining the complaint against demurrer, this Court said (p. 332): "In so holding,

we deal only with the case as now presented and with the parties now before us. We do not consider the status of adverse claims, if there be any, of others not parties to this action. And nothing we have said is to be construed as foreclosing the assertion of any such claim to the fund involved, by intervention or other appropriate proceeding. We decide only that the complaint alleges facts sufficient to constitute a cause of action against the respondents."

The questions thus explicitly reserved are presented by the case now before us. The courts of New York, in the exercise of the constitutional authority ordinarily possessed by state courts to declare the rules of law applicable to property located within their territorial limits, have refused to recognize the Soviet decrees as depriving creditors and other claimants representing the interests of the insurance company of their rights under New York law. Numerous individual creditors and other claimants, and the New York Superintendent of Insurance, who represents all claimants, are parties to the present suit and assert their claims to the exclusion of the United States.

It is true that this Court, in the *Belmont* case, indulged in some remarks as to the effect on New York law of our diplomatic recognition of the Soviet Government and of the assignment of all its claims against American nationals to the United States. Upon the basis of these observations it thought that the New York courts were bound to recognize and apply the Soviet decrees to property which was located in New York when the decrees were promulgated. But all this was predicated upon the mistaken assumption that by disregarding the decrees the New York courts would be giving an extraterritorial effect to New York law. These observations were irrelevant to the decision there announced and, for reasons shortly to be given, I think plainly inapplicable here. They were but *obiter dicta* which, so far as they have not been discredited by

244

our decision in *Guaranty Trust Co.* v. *United States,* 304 U. S. 126, and so far as they now merit it "may be respected, but ought not to control the judgment in a subsequent suit, when the very point is presented for decision." Chief Justice Marshall in *Cohens* v. *Virginia,* 6 Wheat. 264, 399; Mr. Justice Sutherland in *Williams* v. *United States,* 289 U. S. 553, 568.

We have no concern here with the wisdom of the rules of law which the New York courts have adopted in this case or their consonance with the most enlightened principles of jurisprudence. State questions do not become federal questions because they are difficult or because we may think that the state courts have given wrong answers to them. The only questions before us are whether New York has constitutional authority to adopt its own rules of law defining rights in property located in the state, and, if so, whether that authority has been curtailed by the exercise of a superior federal power by recognition of the Soviet Government and acceptance of its assignment to the United States of claims against American nationals, including the New York property.

I shall state my grounds for thinking that the pronouncements in the *Belmont* case, on which the Court relies for the answer to these questions, are without the support of reason or accepted principles of law. No one doubts that the Soviet decrees are the acts of the government of the Russian state, which is sovereign in its own territory, and that in consequence of our recognition of that government they will be so treated by our State Department. As such, when they affect property which was located in Russia at the time of their promulgation, they are subject to inquiry, if at all, only through our State Department and not in our courts. *Underhill* v. *Hernandez,* 168 U. S. 250; *Oetjen* v. *Central Leather Co.,* 246 U. S. 297; *Ricaud* v. *American Metal Co.,* 246 U. S. 304, 308–10; *Salimoff & Co.* v. *Standard Oil Co.,* 262 N. Y. 220,

186 N. E. 679. But the property to which the New York judgment relates has at all relevant times been in New York in the custody of the Superintendent of Insurance as security for the policies of the insurance company, and is now in the Superintendent's custody as Liquidator acting under the direction of the New York courts. *United States* v. *Bank of New York Co.,* 296 U. S. 463, 478–79. In administering and distributing the property thus within their control, the New York courts are free to apply their own rules of law, including their own doctrines of conflict of laws, see *Erie R. Co.* v. *Tompkins,* 304 U. S. 64, 78; *Griffin* v. *McCoach,* 313 U. S. 498; *Kryger* v. *Wilson,* 242 U. S. 171, 176, except insofar as they are subject to the requirements of the full faith and credit clause—a clause applicable only to the judgments and public acts of states of the Union and not those of foreign states. *Aetna Life Insurance Co.* v. *Tremblay,* 223 U. S. 185; cf. *Bank of Augusta* v. *Earle,* 13 Pet. 519, 589–90; *Bond* v. *Hume,* 243 U. S. 15, 21–22.

This Court has repeatedly decided that the extent to which a state court will follow the rules of law of a recognized foreign country in preference to its own is wholly a matter of comity, and that, in the absence of relevant treaty obligations, the application in the courts of a state of its own rules of law rather than those of a foreign country raises no federal question. *Rose* v. *Himely,* 4 Cranch 241; *Harrison* v. *Sterry,* 5 Cranch 289; *United States* v. *Crosby,* 7 Cranch 115; *Oakey* v. *Bennett,* 11 How. 33, 43–46; *Hilton* v. *Guyot,* 159 U. S. 113, 165–66; *Disconto Gesellschaft* v. *Umbreit,* 208 U. S. 570; cf. *Baglin* v. *Cusenier Co.,* 221 U. S. 580, 594–97; *United States* v. *Guaranty Trust Co.,* 293 U. S. 340, 345–47. This is equally the case when a state of the Union refuses to apply the law of a sister state, if there is no question of full faith and credit, *Kryger* v. *Wilson, supra; Finney* v. *Guy,* 189 U. S. 335, 340, 346; *Alropa Corp.* v. *Kirchwehm,* 313 U. S. 549; see *Milwaukee County*

v. *White Co.*, 296 U. S. 268, 272–73, or due process, *Home Ins. Co.* v. *Dick*, 281 U. S. 397.  So clearly was this thought to be an appropriate exercise of the power of a forum over property within its territorial jurisdiction that this Court, in *Ingenohl* v. *Olsen & Co.*, 273 U. S. 541, 544–45, accepted as beyond all doubt the right of the British courts in Hong Kong to refuse recognition to the American alien property custodian's transfer of exclusive rights to the use of a trademark in Hong Kong, and the Court gave effect here to the Hong Kong judgment.

In the application of this doctrine, this Court has often held that a state, following its own law and policy, may refuse to give effect to a transfer made elsewhere of property which is within its own territorial limits.  *Green* v. *Van Buskirk,* 5 Wall. 307, 311–12; *Hervey* v. *Rhode Island Locomotive Works,* 93 U. S. 664; *Security Trust Co.* v. *Dodd, Mead & Co.,* 173 U. S. 624; *Clark* v. *Williard,* 292 U. S. 112, 122; *Clark* v. *Williard,* 294 U. S. 211.  So far is a state free in this respect that the full faith and credit clause does not preclude the attachment by local creditors of the property within the state of a foreign corporation, all of whose property has been previously transferred in the state of its incorporation to a statutory successor for the benefit of creditors.  *Clark* v. *Williard, supra; Fischer* v. *American United Life Ins. Co.,* 314 U. S. 549.  Due process under the Fifth Amendment, the benefits of which extend to alien friends as well as to citizens, *Russian Volunteer Fleet* v. *United States,* 282 U. S. 481, does not call for any different conclusion.  *Disconto Gesellschaft* v. *Umbreit, supra,* 579–80.

At least since 1797, *Barclay* v. *Russell,* 3 Vesey, Jr., 424, 428, 433, the English courts have consistently held that foreign confiscatory decrees do not operate to transfer title to property located in England, even if the decrees were so intended, whether the foreign government has or has not been recognized by the British Government.  *Lecouturier*

v. *Rey,* [1910] A. C. 262, 265. Cf. also *Folliott* v. *Ogden,*
1 H. Black. 123, 135–36, affirmed 3 T. R. 726, affirmed, 4
Brown's Cases in Parl., 111; and *Wolff* v. *Oxholm,* 6 M. &
S. 92, both of which may have carried the doctrine of non-
recognition of foreign confiscatory decrees even further.
See Holdsworth, The History of Acts of State in English
Law, 41 Columbia L. Rev. 1313, 1325–26. The English
courts have applied this rule in litigation arising out of the
Russian decrees, holding that they are not effectual to
transfer title to property situated in Great Britain. *Sedg-
wick Collins & Co.* v. *Rossia Insurance Co.,* [1926]· 1 K. B.
1, 15, affirmed, [1927] A. C. 95; *The Jupiter (No. 3),*
[1927] P. 122, 144–46, affirmed, [1927] P. 250, 253–55; *In
re Russian Bank for Foreign Trade,* [1933] 1 Ch. 745,
767–68. The same doctrine has prevailed in the case of
the Spanish confiscatory decrees, *Banco de Vizcaya* v. *Don
Alfonso,* [1935] 1 K. B. 140, 144–45, as well as with respect
to seizures by the American alien property custodian.
*Sutherland* v. *Administrator of German Property,* [1934]
1 K. B. 423; and see the decision of the British court for
Hong Kong discussed in *Ingenohl* v. *Olsen & Co., supra,*
and the Privy Council's decision in *Ingenohl* v. *Wing On &
Co.,* 44 Patents Journal 343, 359–60. In no case in which
there was occasion to decide the question has recognition
been thought to have subordinated the law of the forum,
with respect to property situated within its territorial juris-
diction, to that of the recognized state. Never has the
forum's refusal to follow foreign transfers of title to such
property been considered inconsistent with the most
friendly relations with the recognized foreign government,
or even with an active military alliance at the time of the
transfer.

It is plain that under New York law the claimants in
this case, both creditors and those asserting rights of the
insurance company, have enforcible rights, with respect to
the property located there, which have been recognized

though not created by the judgments of its courts. The conclusion is inescapable that, had there been no assignment and this suit had been maintained by the Soviet Government subsequent to recognition, or by a private individual claiming under an assignment from it, the decision of the New York court would have presented no question reviewable here.

The only question remaining is whether the circumstances in the present case, that the Russian decrees preceded recognition and that the assignment was to the United States, which here appears in the role of plaintiff, call for any different result. If they do, then recognition and the assignment have operated to give to the United States rights which its assignor did not have. They have compelled the state to surrender its own rules of law applicable to property within its limits, and to substitute rules of Russian law for them. A potency would thus be attributed to the recognition and assignment which is lacking to the full faith and credit clause of the Constitution. See *Clark* v. *Williard, supra; Fischer* v. *American United Life Ins. Co., supra.*

In deciding any federal question involved, it can make no difference to us whether New York has chosen to express its public policy by statute or merely by the common law determinations of its courts. *Erie R. Co.* v. *Tompkins, supra,* 304 U. S. 64; *Skiriotes* v. *Florida,* 313 U. S. 69, 79; *Hebert* v. *Louisiana,* 272 U. S. 312, 316. The state court's repeated declaration of a policy of treating the New York branch of the insurance company as a "complete and separate organization" would permit satisfaction of whatever claims of foreign creditors, as well as those of sister states, that New York deems provable against the local fund. But if my brethren are correct in concluding that all foreign creditors must be deprived of access to the fund, it would seem to follow—since the Soviet decrees have exempted no class of creditors—that the rights of

creditors in New York or in sister states, or any other rights in the property recognized by New York law, must equally be ousted by virtue of the extraterritorial effect given to the decrees by the present decision. For, statutory priorities of New York policyholders or New York lienholders, and the common law priorities and system of distribution which the judgment below endeavored to effectuate and preserve intact, must alike yield to the superior force said to have been imparted to the Soviet decrees by the recognition and assignment. Nothing in the Litvinov assignment or in the negotiations for recognition suggests an intention to impose upon the states discriminations between New York and other creditors which would sustain the former's liens while obliterating those of the latter. If the Litvinov assignment overrides state policies which protect foreign creditors, it can hardly be thought to do less to domestic creditors, whether of New York or a sister state.

I assume for present purposes that these sweeping alterations of the rights of states and of persons could be achieved by treaty or even executive agreement, although we are referred to no authority which would sustain such an exercise of power as is said to have been exerted here by mere assignment unratified by the Senate. It is true that, in according recognition and in establishing friendly relations with a foreign country, this Government speaks for all the forty-eight states. But it was never true that recognition alters the substantive law of any state or prescribes uniform state law for the nationals of the recognized country. On the contrary, it does not even secure for them equality of treatment in the several states, or equal treatment with citizens in any state, save as the Constitution demands it. *Patsone* v. *Pennsylvania,* 232 U. S. 138; *Terrace* v. *Thompson,* 263 U. S. 197; *Clarke* v. *Deckebach,* 274 U. S. 392 and cases cited. Those are ends which can be achieved only by the assumption of some

form of obligation expressed or fairly to be inferred from its words.

Recognition, like treaty making, is a political act, and both may be upon terms and conditions. But that fact no more forecloses this Court, where it is called upon to adjudicate private rights, from inquiry as to what those terms and conditions are than it precludes, in like circumstances, a court's ascertaining the true scope and meaning of a treaty. Of course, the national power may by appropriate constitutional means override the power of states and the rights of individuals. But, without collision between them, there is no such loss of power or impairment of rights, and it cannot be known whether state law and private rights collide with political acts expressed in treaties or executive agreements until their respective boundaries are defined.

It would seem, therefore, that in deciding this case some inquiry should have been made to ascertain what public policy or binding rule of conduct with respect to state power and individual rights has been proclaimed by the recognition of the Soviet Government and the assignment of its claims to the United States. The mere act of recognition and the bare transfer of the claims of the Soviet Government to the United States can, of themselves, hardly be taken to have any such effect, and they can be regarded as intended to do so only if that purpose is made evident by their terms, read in the light of diplomatic exchanges between the two countries and of the surrounding circumstances. Even when courts deal with the language of diplomacy, some foundation must be laid for inferring an obligation where previously there was none, and some expression must be found in the conduct of foreign relations which fairly indicates an intention to assume it. Otherwise, courts, rather than the executive, may shape and define foreign policy which the executive has not adopted.

We are not pointed to anything on the face of the documents or in the diplomatic correspondence which even suggests that the United States was to be placed in a better position, with respect to the claim which it now asserts, than was the Soviet Government and nationals. Nor is there any intimation in them that recognition was to give to prior public acts of the Soviet Government any greater extraterritorial effect than attaches to such acts occurring after recognition—acts which, by the common understanding of English and American courts, are ordinarily deemed to be without extraterritorial force, and which, in any event, have never before been considered to restrict the power of the states to apply their own rules of law to foreign-owned property within their territory. As we decided in *Guaranty Trust Co.* v. *United States, supra,* 304 U. S. at 143, and as the opinion of the Court now appears to concede, there is nothing in any of the relevant documents "to suggest that the United States was to acquire or exert any greater rights than its transferor or that the President by mere executive action purported or intended to alter or diminish the rights of the [New York] debtor with respect to any assigned claims, or that the United States, as assignee, is to do more than the Soviet Government could have done after diplomatic recognition—that is, collect the claims in conformity to local law."

Recognition opens our courts to the recognized government and its nationals, see *Guaranty Trust Co.* v. *United States, supra,* 140. It accepts the acts of that government within its own territory as the acts of the sovereign, including its acts as a *de facto* government before recognition, see *Underhill* v. *Hernandez, supra,* 168 U. S. 250; *Oetjen* v. *Central Leather Co., supra,* 246 U. S. 297; *Ricaud* v. *American Metal Co., supra,* 246 U. S. 304. But, until now, recognition of a foreign government by this Government has never been thought to serve as a full faith and

credit clause compelling obedience here to the laws and public acts of the recognized government with respect to property and transactions in this country. One could as well argue that by the Soviet Government's recognition of our own Government, which accompanied the transactions now under consideration, it had undertaken to apply in Russia the New York law applicable to Russian property in New York. Cf. *Ingenohl* v. *Olsen & Co., supra,* 273 U. S. 541; *Pacific Ins. Co.* v. *Industrial Comm'n,* 306 U. S. 493, 501–02.

In *Guaranty Trust Co.* v. *United States, supra,* this Court unanimously rejected the contention that the recognition of the Soviet Government operated to curtail or impair rights derived from the application of state laws and policy within the state's own territory. It was argued by the Government that recognition operated retroactively, for the period of the *de facto* government, to set aside rights acquired in the United States in consequence of this Government's prior recognition of the Russian Provisional Government. This argument, we said, p. 140, "ignores the distinction between the effect of our recognition of a foreign government with respect to its acts within its own territory prior to recognition, and the effect upon previous transactions consummated here between its predecessor and our own nationals. The one operates only to validate to a limited extent acts of a *de facto* government which by virtue of the recognition, has become a government *de jure.* But it does not follow that recognition renders of no effect transactions here with a prior recognized government in conformity to the declared policy of our own Government." Even though the two governments might have stipulated for alteration by this Government of its municipal law, and the consequent surrender of the rights of individuals, the substance of the Court's decision was that such an abdication of domestic law and policy is not a necessary or customary incident

of recognition or fairly to be inferred from it. No more can recognition be said to imply a deprivation of the constitutional rights of states of the Union, and of individuals arising out of their laws and policy, which are binding on the Federal Government except as the act of recognition is accompanied by some affirmative exercise of federal power which purports to set them aside.

Nor can I find in the surrounding circumstances or in the history of the diplomatic relations of the two countries any basis for saying that there was any policy of either to give a different or larger effect to recognition and the assignment than would ordinarily attach to them. It is significant that the account of the negotiations published by the State Department (Establishment of Diplomatic Relations with the Union of Soviet Socialist Republics, Eastern European Series No. 1), and the report of subsequent negotiations for adjustment of the claims of the two countries submitted to Congress by the Secretary of State (H. Rep. No. 865, 76th Cong., 1st Sess.) give no intimation of such a policy. Even the diplomatic correspondence between the two countries, of January 7, 1937, to which the opinion of the Court refers, and which occurred long after the United States had entered the Moscow Fire Insurance Company litigation, merely repeated the language of the assignment without suggesting that its purpose had been to override applicable state law.

That the assignment after recognition had wide scope for application without reading into it any attempt to set aside our local laws and rights accruing under them is evident. It was not limited in its application to property alleged to be confiscated under the Soviet decrees. Included in the assignment, by its terms, were all "amounts admitted to be due or that may be found to be due it [the Soviet Government], as the successor of prior Governments of Russia, or otherwise, from American nationals." It included claims of the prior governments of

Russia, not arising out of confiscatory decrees, and also claims like that of the Russian Volunteer Fleet, growing out of our own expropriation during the war of the property of Russian nationals. The assignment was far from an idle ceremony if treated as transferring only the rights which it purports to assign. Large sums of money have already been collected under it, and other amounts are in process of collection, without overturning the law of the states where the claims have been asserted.[1]

At the time of the assignment, it was not known what position the courts of this country would take with respect to property here, claimed to have been confiscated by the Soviet decrees. But it must have been known to the two governments that the English courts notwithstanding British recognition of the Soviet Government, had refused to apply the Soviet decrees as affecting property located in England. *Sedgwick Collins & Co.* v. *Rossia Insurance Co., supra; The Jupiter (No. 3), supra; In re Russian Bank for Foreign Trade, supra.* It must also have been known that the similar views expressed by the New York courts before recognition with respect to property situated in New York raised at least a strong possibility that mere recognition would not alter the result in that state. *Sokoloff* v. *National City Bank,* 239 N. Y. 158, 167–69, 145 N. E. 917; *James & Co.* v. *Second Russian Ins. Co.,* 239 N. Y. 248, 257, 146 N. E. 369; *Joint Stock Co.* v. *National City Bank,* 240 N. Y. 368, 148 N. E. 552; *Petrogradsky M. K. Bank* v. *National City Bank,* 253 N. Y. 23, 29, 170 N. E. 479. The assignment plainly contemplated that this, like every other question affecting liability, was to be litigated in the courts of this country, since the

---

[1] By June 30, 1938, the sums collected by virtue of the Litvinov assignment amounted to $1,706,443. Report of the Attorney General for 1938, p. 122. Other claims are apparently still in litigation. See the Report for 1939, p. 99; also H. Rep. No. 865, 76th Cong., 1st Sess., p. 2.

assignment only purported to assign amounts admitted to be due or "that may be found to be due." It was only in the courts where the debtor or the property was located that the amounts assigned would normally be "found to be due." Cf. *United States* v. *Bank of New York Co.*, *supra*, 296 U. S. 463.

By transferring claims of every kind, against American nationals, to the United States and leaving to it their collection, the parties necessarily remitted to the courts of this country the determination of the amounts due upon this Government's undertaking to report the amounts collected as "preparatory to a final settlement of the claims and counterclaims" asserted by the two governments. They thus ended the necessity of diplomatic discussion of the validity of the claims, and so removed a probable source of friction between the two countries. In all this, I can find no hint that the rules of decision in American courts were not to be those afforded by the law customarily applied in those courts. But if it was the purpose of either government to override local law and policy of the states and to prescribe a different rule of decision from that hitherto recognized by any court, it would seem to have been both natural and needful to have expressed it in some form of undertaking indicating such an intention. The only obligation to be found in the assignment and its acknowledgment by the President is that of the United States, already mentioned, to report the amounts collected. This can hardly be said to be an undertaking to strike down valid defenses to the assigned claims. Treaties, to say nothing of executive agreements and assignments which are mere transfers of rights, have hitherto been construed not to override state law or policy unless it is reasonably evident from their language that such was the intention. *Guaranty Trust Co.* v. *United States, supra,* 304 U. S. at 143; *Todok* v. *Union State Bank,* 281 U. S. 449, 454; *Rocca* v. *Thompson,* 223 U. S. 317, 329–34; *Disconto*

*Gesellschaft* v. *Umbreit, supra,* 208 U. S. at 582; *Pearl Assurance Co.* v. *Harrington,* 38 F. Supp. 411, 413–14; affirmed, 313 U. S. 549; *Patsone* v. *Pennsylvania,* 232 U. S. 138, 145–46; cf. *Liverpool Ins. Co.* v. *Massachusetts,* 10 Wall. 566, 568, 576–77. The practical consequences of the present decision would seem to be, in every case of recognition of a foreign government, to foist upon the executive the responsibility for subordinating domestic to foreign law in conflicts cases, whether intended or not, unless such a purpose is affirmatively disclaimed.

Under our dual system of government, there are many circumstances in which the legislative and executive branches of the national government may, by affirmative action expressing its policy, enlarge the exercise of federal authority and thus diminish the power which otherwise might be exercised by the states. It is indispensable to the orderly administration of the system that such alteration of powers and the consequent impairment of state and private rights should not turn on conceptions of policy which, if ever entertained by the only branch of the government authorized to adopt it, has been left unexpressed. It is not for this Court to adopt policy, the making of which has been by the Constitution committed to other branches of the government. It is not its function to supply a policy where none has been declared or defined and none can be inferred.

MR. JUSTICE ROBERTS joins in this opinion.