DAVID R. GREENE *vs.* PACIFIC MUTUAL INSURANCE COMPANY.

A warranty by the insured in a policy of insurance that the vessel shall be free from capture, seizure or detention, does not include a mutinous taking possession of the vessel by the mariners.

If a whaling vessel has been barratrously taken from the possession of the master by the crew, and possession of her has subsequently been regained, and she has been brought into a foreign port with the loss of all her whaling gear and a portion of her other equipments and stores, and damaged in some places by fire, and the funds necessary to pay for refitting and repairing her, and procuring officers or men suitable for the further prosecution of her voyage, cannot be obtained by the exercise of due diligence, and communication cannot be had with the owners for many months, and in consequence of these facts her intended voyage is wholly broken up, and she is taken possession of by the United States consul and sent home for the benefit of whom it may concern, it is competent for a jury to find a verdict against the insurers for a constructive total loss, under a policy of insurance " against a total loss only," barratry being one of the perils insured against.

CONTRACT upon a policy of insurance on the ship Junior and whaling outfits.

The case was heard in this court before *Chapman, J.*, who on the facts shown, which are sufficiently stated in the opinion, ruled *pro forma* that the plaintiff was not entitled to recover, and reported the case for the consideration of the whole court. · If, upon the evidence, it was competent for the jury to find a verdict for the plaintiff, judgment for the plaintiff is to be entered; otherwise, for the defendants.

*T. D. Eliot & T. M. Stetson,* for the plaintiff. The loss was a loss by barratry. *Waters* v. *Merchants' Louisville Co.* 11 Pet. 213. *Suckley* v. *Delafield,* 2 Caines R. 222. *Potter* v. *Ocean Ins. Co.* 3 Sumner, 27. *American Ins. Co.* v. *Dunham,* 12 Wend. 463. *Howlock* v. *Hancill,* 3 T. R. 277. *Vallejo* v. *Wheeler,* Cowp. 143. The warranty against seizure does not apply to the facts in the case. *Dole* v. *New England Ins. Co.* 6 Allen, 394. *Carrington* v. *Merchants' Ins. Co.* 8 Pet. 568. The policy

covers a constructive loss. .*Heebner* v. *Eagle Ins. Co.* 10 Gray, 136. The case falls within the rule stated in Phil. Ins. § 1521. " The assured on any subject may abandon when the voyage is broken up in respect to that subject by the perils insured against." *Cologan* v. *London Ass. Co.* 5 M. & S. 447. *McIver* v. *Henderson,* 4 M. & S. 576. *Rhinelander* v. *Ins. Co.* 4 Cranch, 29. *Marshall* v. *Delaware Ins. Co.* Ib. 202. *Dixon* v. *Reid,* 5 B. & Ald. 597 ; S. C. 1 D. & R. 207. *Abbott* v. *Broome,* 1 Caines R. 292. *Tudor* v. *New England Ins. Co.* 12 Cush. 555.

*J. H. Clifford,* ( *O. Prescott* with him,) for the defendants. There was no loss by any risk covered by the policy. *Kleinwort* v. *Shepard,* 1 El. & El. 447. *Dole* v. *New England Ins. Co.* 6 Allen, 373. The policy was for a total loss only, and the plaintiff cannot therefore recover for any loss not total. The loss of a voyage is not a loss of the ship. *Pole* v. *Fitzgerald,* Willes, 641. *Fitzgerald* v. *Pole,* 4 Bro. P. C. (2d ed.) 439. *Anderson* v. *Wallis,* 2 M. & S. 240. *Everth* v. *Smith,* Ib. 278. *Falkner* v. *Ritchie,* Ib. 290. *Oliver* v. *Newburyport Ins. Co.* 3 Mass. 67. *Lawton* v. *Sun Ins. Co.* 2 Cush. 500. Besides, this is a time policy. *Wales* v. *China Ins. Co.* 8 Allen, 380. The existing circumstances would not have justified a sale. *Paddock* v. *Commercial Ins. Co.* 2 Allen, 99. *Stephenson* v. *Pacific Ins. Co.* 7 Allen, 235. *Peirce* v. *Ocean Ins. Co.* 18 Pick. 88. No sale was made, but the vessel was fitted up and sent on a new voyage If this was done by the master, it was for the owner's benefit. If by the consul, this was a risk not insured against. *Paddock* v. *Commercial Ins. Co.* and *Dole* v. *New England Ins. Co., ubi supra.* The abandonment was too late.

BIGELOW, C. J. Two questions are raised in this case. The first and preliminary one is, whether the defendants are liable at all upon the policy set forth in the declaration. If this be answered in the affirmative, the next inquiry is, whether the facts show a total loss of the ship and outfits.

The answer to be given to the first question depends on the construction of that clause in the policy by which the vessel and outfits are warranted to be " free from loss or expense arising from capture, seizure or detention." It is contended by the

defendants that the facts proved at the trial bring this case within the exception created by this warranty, because they show a " seizure " of the vessel by the mutinous acts of the crew. If a con tract of marine insurance could properly be interpreted literally, and its language be applied to facts in proof, with a single eye to the special circumstances under which the alleged loss of a vessel or cargo in each particular case happened, the positions assumed by the defendants might be supported. But such a rule of construction cannot be adopted in the exposition of this class of contracts. A policy of insurance is a commercial con-tract, based on the usages and customs of trade, expressed in a brief and inartificial form, and in some of its parts in peculiar and technical language, containing numerous stipulations, some of which are comprehended in a few short phrases, and others which arise solely by implication, and are not obvious on the face of the instrument. It cannot therefore be correctly inter-preted by regarding only the rules applicable to ordinary written contracts. The intention of the parties, as gathered from the tenor of the policy, is, as in all other cases, to be the guide by following which a true exposition of the contract can be reached ; but this intention cannot be ascertained unless the language used by the parties is construed with reference to the well known and established practice of all commercial communities, to the particular meaning which is attached by mercantile usage to certain words and phrases, to the nature and character of the risk or adventure to which the policy relates, and to the recog-nized rules of jurisprudence applicable to this species of contract.

Applying these principles of construction to the words of the warranty in the policy declared on, by which the insurers are exempted from liability for certain risks, and interpreting them in connection with the clause which they are designed to qualify and restrict, we think it very clear that the parties did not intend to include within the warranty a peril such as is shown to have occasioned the alleged loss of the ship and outfits. There can be no doubt that the facts proved at the trial establish an indisput-able case of barratry. It is equally clear that all the disastrous consequences which followed were the necessary and natural

results of the mutinous and criminal conduct of the crew of the ship. Nor can there be any room for question that, under the general clause in the policy enumerating the perils which the insurers are contented to bear, they must be held liable on the evidence adduced at the trial for a total loss, if proved to have been caused by the barratrous acts of the crew, unless relieved therefrom by the warranty against the risk of " seizure." Barratry is one of the enumerated perils against which the defendants insured the plaintiff. This is a generic term which includes many acts of various kinds and degrees. It comprehends any unlawful, fraudulent or dishonest act of the master or mariners, and every violation of duty by them arising from gross and culpable negligence contrary to their duty to the owner of the vessel, and which might work loss or injury to him in the course of the voyage insured. A mutiny of the crew and forcible dispossession by them of the master and other officers from the ship is only one form of barratry. Now it is obvious, in a practical point of view, that no reasons existed for exempting this particular mode of committing the act from the general risk of barratry which the underwriters assumed. There was nothing in the nature of the voyage, or the business in which the ship was to engage, which furnished occasion for such exception. Nor is it reasonable to suppose that the parties, if they contemplated such a special warranty against a particular form or mode of committing an act of barratry, would have expressed it in language which, as applied to the subject matter, leaves this meaning, to say the least, exceedingly doubtful and ambiguous. This consideration is of itself quite decisive of the construction which it is our duty to put on the policy declared on. Inasmuch as barratry is one of the risks assumed by the assured, unless particular acts are clearly excepted in terms which leave no doubt as to their meaning, the general words of the policy must have full operation. 1 Phil. Ins. § 1163. *Lawrence* v *Aberdein,* 5 B. & Ald. 107.

But we do not deem it necessary to put the decision of this point on so narrow a ground. Upon careful consideration, we are of opinion that the exception of a loss by seizure does not

include the risk of mutiny of the mariners and the forcible taking of the ship from the control of the officers ; or, in other words, that it does not properly exclude from the operation of the policy a loss by barratry. Certainly the word " seizure " cannot be applied to any barratrous act of the master. He has by law possession and control of the ship. He may, it is true, take her out of her course, or convert her to his own use in violation of his duty to the owners. But he cannot be justly said to seize that which is already in his own keeping. The same is true to a certain extent of the mariners. While in the discharge of their duty they have a qualified possession of the vessel. Subject to the order of the master, it is in their care and custody. If they violate their duty and disobey the master, displace him from command and assume entire control of the vessel, it is a breach of trust rather than a seizure. *Lawton* v. *Sun Ins. Co.* 2 Cush. 500, 514. It can be properly described only as barratry, in like manner as misappropriation of money by a servant or agent to whom it is intrusted is, correctly speaking, embezzlement, and not larceny. Indeed, the word " seizure," as applied to the contract of insurance, may be said to import the taking possession of a ship or vessel by superior force, or by violence from without, and not a barratrous conversion of her by the officers and crew, or either of them. No adjudicated case can be found in which it has been interpreted to include an act of the latter character. The recent case of *Kleinwort* v. *Shepard*, 1 El. & El. 447, cited by the defendants' counsel, is authority only for the position that a forcible dispossession of the master and mariners by passengers acting mutinously might properly be deemed a seizure. We are not prepared to say that the conclusion arrived at by the court in that case was a sound one. But it differs essentially from the case at bar in the leading fact that the ship was there forcibly taken possession of by persons who were incapable of committing an act of barratry, because they had no care or custody of the ship, and stood in no relation of trust towards the owners. There was some ground, therefore, for regardin the mutinous act of the passengers as violence from without, and so within the warranty which exempted the

insurers from loss by seizure. That the word was not intended to be used in any broader sense, in the policy declared on, so as to embrace the barratrous acts of the crew, is manifest from the connection in which it stands in the warranty. The exemption is from liability for loss by reason of capture, seizure or detention. Capture and detention are both risks which can arise only from acts of persons having no connection with the ship, who take her out of the possession of the master and mariners forcibly, either without right or by the authority of law. The rule of interpretation, that words coupled together in the same sentence are to be understood and construed *in eodem sensu,* warrants the conclusion that "seizure" was intended to be understood as having reference to a similar class of risks, and to exempt the insurers from liability to loss arising from a forcible taking of the vessel by others than the officers or crew.

Authority is not wanting for the position that "seizure," in a contract of insurance, is always to be understood in a restricted and limited sense, as signifying only the taking of a ship by the act of governments or other public authority for a violation of the laws of trade, or some rule or regulation instituted as a matter of municipal police, or in consequence of an existing state of war. It is so understood in the commercial code of continental Europe. In this sense, too, it is used in other clauses of the policy declared on which exempt the underwriters from liability for "seizure for or on account of illicit or prohibited trade, or trade in articles contraband of war." Such undoubtedly is its most common and ordinary signification, as applied to the subject matter of marine insurance. Whether it can have a broader meaning, so as to include a forcible taking of a ship as an act of hostility or for the purpose of plunder, it is not necessary now to determine. It is sufficient for the decision of the present case to say, that it cannot be interpreted to include the dispossession of the master and other officers from the ship by the mariners, and the barratrous conversion of her by them to their own use.

This brings us to the consideration of the other question in

the case, whether the plaintiffs are entitled to recover for a total loss of the vessel and outfits. The insurance was against total loss only. Under a policy so framed, the insured have a right to claim indemnity for a constructive as well as an actual total loss. *Heebner* v. *Eagle Ins. Co.* 10 Gray, 131. On the facts disclosed at the trial, the only point of contention is, whether the plaintiff has shown such a state of things as to warrant an abandonment of the ship and outfits, and to sustain his claim for a constructive total loss. In discussing this question, two material facts are to be borne in mind, which are indisputably established by the evidence. The first is, that there was at one point of time during the continuance of the risk an actual total loss of ship and outfits, by the complete and absolute privation of the owner's possession and control of the ship, while the mutineers continued to hold her. The other is, that the voyage for which the insurance was effected was wholly broken up and abandoned, so that the insured were effectually deprived of all benefit and profit which might have arisen therefrom. In this aspect of the case, the real question at issue is, whether the ship was restored to the owners' possession and control under circumstances which would defeat the right to abandon her and to claim a total loss. The abandonment in the present case was not made while the ship was in the hands of the mutineers, but long afterwards, and subsequent to the time when she had been virtually restored to the possession and control of her owners by being left in the care of the mate, who brought her into port. As the right of the assured to claim for a total loss depends on the state of facts existing at the time of the abandonment, it necessarily follows that the previous restitution of the ship to the custody of the mate, by preventing an actual total loss, renders it necessary to consider her condition in port and the attendant circumstances at the time of such restoration, in order to ascertain whether the abandonment was justified, and a claim for a total loss was warranted by the facts as they are shown to have thus existed.

The doctrine enunciated in some of the early cases, and which had its origin at a time when wagering policies were commonly

issued, that a loss of a voyage constitutes a loss of a ship, is not the rule of law as recognized in the modern authorities in England, or by the decisions of the courts in this country. The true distinction on the subject was first stated in the leading case of *Pole* v. *Fitzgerald*, Willes, 641; Ambl. 214; and in the same case in the House of Lords, *Fitzgerald* v. *Pole*, 4 Bro. P. C. (2d ed.) 439. Although in some subsequent cases in the time of Lord Mansfield there is a confusion in the *dicta* of the courts, which indicates that the real nature of the contract of insurance on a ship for a voyage, so far as it secures an indemnity to the assured against loss by reason of the non-performance of the voyage, was not clearly understood or borne in mind, it is now well settled that the loss of the voyage named in the policy, although caused by a sea peril, does not necessarily involve a loss of the ship. The course of decisions in England on this subject is concisely and clearly stated in 2 Arnould on Ins. 1064–1071. The true principle on which the contract of insurance against total loss of a ship rests is, that the underwriters agree that the ship shall be capable of performing the voyage insured, notwithstanding any loss or injury which happens to her in consequence of a peril insured against. The undertaking is not that the voyage named shall be performed, nor that it shall not be prevented by the perils of the sea. The risk assumed is not on the voyage, but on the ship for the voyage. If the ship is hindered from completing the voyage by reason of perils falling on the cargo or freight, no liability accrues thereby against the insurer of the ship. He did not undertake that the cargo should be carried safely to its destination, or that the freight should be carried. But if the voyage should be defeated, the freight not carried, and the cargo prevented from reaching the place for which it was shipped in consequence of a peril insured against happening to the ship, whereby it was disabled and rendered incapable of going on to the terminus of the voyage, the insurer would be liable, because the loss of the voyage would in such case be caused by a peril falling on the subject insured. The rule is general, that the assured on any subject may abandon when a voyage is broken up and lost, in respect to that subject, by the

perils insured against. 2 Phil. Ins. §§ 1521, 1523. 2 Arnould on Ins. 1071. *Falkner* v. *Ritchie,* 2 M. & S. 290. *Brown* v. *Smith,* 1 Dow, 359. *Parsons* v. *Scott,* 2 Taunt. 363. *Doyle* v. *Dallas,* 1 M. & Rob. 55. *Alexander* v. *Balt. Ins. Co.* 4 Cranch, 370. *Smith* v. *Universal Ins. Co.* 6 Wheat. 176. *Bradlie* v. *Maryland Ins. Co.* 12 Pet. 378, 401, *Ruckman* v. *Merchants' Louisville Ins. Co.* 5 Duer R. 342, 366. In the case at bar, there can be no doubt that the loss was caused by a peril insured against happening to the ship. By the barratry of the mariners, she was taken from the control of the master and other officers, and diverted from the course of the voyage. If this state of things had continued up to the time of abandonment, and there had been no restitution of the ship and outfits, the loss would have been actually total. But they came back again into the owners' possession when the mutineers left her in the hands of the mate. The loss thereby ceased to be actually total. The contract of insurance being one of indemnity, the owner cannot recover for a total loss after the subject insured has been restored to him, unless it appears that at the time of such restitution it was in a condition, arising from a peril insured against, to warrant an abandonment and justify a claim for a constructive total loss. It follows, therefore, that in case of insurance against total loss of a ship, where, by reason of one of the perils enumerated in the policy, the owners have at one period of time during the continuance of the risk been wholly deprived of the possession and control of the ship, but subsequently she has come back again into their hands, as in case of capture and recapture, or seizure for illicit trade and release, the question is not merely whether the voyage has been defeated and given up, but whether the ship is in such condition after her restitution and at the time of abandonment as to be incapable of being repaired and refitted for the voyage at an expense less than half her value, or is so situated as either to render repairs impossible or the further continuance of the voyage impracticable by reason of the inability of the master or other agent of the owners in a reasonable time and with the use of all proper means and due diligence, at the port or place where he may be,

to put the vessel in a state suitable for its further prosecution. 2 Phil. Ins. §§ 1522, 1528, 1531. 2 Arnould on Ins. 1063, 1071, *Holdsworth* v. *Wise,* 7 B. & C. 794. *McIver* v. *Henderson,* 4 M. & S. 576. *Dean* v. *Hornley,* 3 El. & Bl. 179, 186. *Wood* v. *Lincoln, &c. Ins. Co.* 6 Mass. 479, 482. *Marine Ins. Co.* v. *Tucker,* 3 Cranch, 357. In considering what the duty of a master or other agent of the owners may be in a case where, after the loss of a ship by a peril insured against, he regains possession of her and arrives at a port of necessity, we suppose that the same standard of diligence is to be applied in all cases, whatever may have been the peril by which the exigency has been occasioned. The duty of the master or other agent of the owners is the same, whether the inability of a vessel to continue a voyage caused by the effects of a peril insured against consists in damage to the vessel arising from the effects of the winds and waves, or by the loss of officers and crew, or want of some materials or equipment necessary to render her fit for the further prosecution of the voyage. In such a case, if the vessel is in a port of necessity in a foreign land at a great distance from the home port, where there are no means of communicating with the owners and receiving advice or aid from them except after the lapse of a long period of time, extending over several months or a year, and the master or agent of the owners is unable with the use of due diligence to procure money to repair and refit the ship for the voyage, or cannot procure the needful equipment or materials, or supply the officers and crew necessary to the continuance and prosecution of the voyage within a reasonable time, it cannot be said that there is any negligence or dereliction of duty in breaking up and abandoning the voyage insured. On the contrary, such a state of things might be sufficient to create a necessity which would warrant a sale of the vessel, for the benefit of whom it might concern, and justify a claim for a total loss, although the actual injury to the ship might be less than half her value. 2 Phil. Ins. §§ 1537, 1578. *American Ins. Co.* v. *Ogden,* 15 Wend. 532. *Allen* v. *Commercial Ins. Co.* 1 Gray, 154. 2 Arnould on Ins. 1083.

The application of these well settled principles to the facts

proved at the trial affords a ready solution of the question whether the defendants can be held liable for a constructive total loss. It is to be observed that, in the form in which the case is reserved for our consideration, we are not called on to say whether the evidence offered by the plaintiff satisfies our own minds that their claim for a total loss is well sustained, but whether it would be competent for a jury to find a verdict in favor of the plaintiff for such loss. In other words, we have only to determine whether it would be the duty of the court to set aside a verdict, if one had been found by a jury for a total loss of the ship and outfits. The evidence discloses this state of facts : The ship was barratrously taken from the command of the officers, and consequently from the possession of the own= ers, on the 25th day of December 1857 ; the master and third officer were killed, and the first and second officers were badly wounded; the ship continued in the possession and control of the mutineers for nine days, till the 3d day of January 1858, when they, ten in number, left the vessel in the hands of the wounded officers and the remainder of the crew, having first injured the vessel to some extent by setting fire to the cabin and after part of the vessel, and having taken with them a. consid-erable quantity of the outfits, and having destroyed the whole of the whaling gear and other portions of the equipment of the vessel. In this condition the mate, who succeeded to the com-mand, made Sydney, New South Wales, as a port of distress, on the 11th day of January 1858. The ship was then in a con= dition which rendered the further prosecution of the voyage utterly impracticable, unless she could be repaired, her whaling craft and gear be replenished, her outfits be replaced, and new officers and crew be procured to take the place of those who had been killed and who had barratrously left the ship. The mate, after the use of due diligence, was unable to raise funds on bottomry or otherwise for the repairs and reëquipment of the ship. It was also impossible to obtain officers and men who were of competent skill and experience in the whale fishery to navigate the vessel and take charge of her during the further prosecution of the voyage. The evidence also tends to show

that the officers who survived the mutiny were incompetent to continue in the vessel in discharge of their respective duties with those of the original crew who remained on board, on account of the loss of their authority and control over the men who had become insubordinate. Nor is there any reason to believe that either money necessary to refit and equip the ship, or officers and men suitable to take charge of her and prosecute the voyage, could have been obtained in any other port in the vicinity of Sydney or in that quarter of the globe; on the contrary, the inference is a reasonable one, that efforts to procure them would have been as fruitless in other ports as in Sydney. The fair result of the evidence then is, that by the barratry of the crew, a peril insured against, the owners were for a time deprived of the possession of their ship, and that after its restoration it arrived at a port of necessity in a condition unfit to continue the voyage, and means did not exist there or elsewhere in that quarter of the world within the reach or control of the mate, nor was he able by the use of due diligence to procure any to refit, re-officer and re-man the vessel. In this state of things, it is clear that the voyage must have been abandoned and given up by reason of a peril falling on the vessel itself, her officers and crew, unless it was the absolute and imperative duty of the mate either to sell sufficient of the outfits to refit the vessel to return home, and endeavor to bring her to this country, or to suffer her to lie there in the port of distress until he could communicate with the owners and obtain from them the necessary funds to repair her and supply the needful outfits, and suitable officers and men could be sent out to prosecute the voyage. But we cannot say that, under the circumstances proved in this case, it would be the duty of a jury to find a verdict for the defendants, because neither of these courses was adopted by the mate. The right to abandon exists, whenever by reason of a peril insured against a ship, for all useful purposes of a ship for the voyage, is for the present gone from the control of the owner, and the time when she will be restored to him in a state to resume the voyage is uncertain or unreasonably distant, or the risk, delay and expense disproportionate to the expected benefit and objects of

the voyage. The question is not merely whether a ship in a port of distress can be repaired for less than half her value so as to be able to resume her voyage, but whether the ship can at a reasonable expense and within a reasonable time be so repaired and refitted, and whether funds can be raised and means obtained to effect that object. Certainly it could not be reasonably required of the mate, under the circumstances in which he was placed at the port of distress, that he should sell sufficient of the outfits to put the ship in a condition to be brought back to the home port and proceed to return hither. The great distance to be traversed, the risk attendant on the voyage to this country, and the uncertainty whether the ship on her arrival here could be put in a condition to resume her voyage at a reasonable cost, to say nothing of the necessary delay and retardation of the voyage, are considerations which would be quite sufficient to prevent a prudent officer, acting with sound discretion, from adopting such a course. Nor are we aware of any authority which gives countenance to the doctrine that a return to the home port, or to the country of the owners of the ship, under circumstances similar to those which are shown to have existed in the present case, would be deemed an act of prudence and discretion on the part of a master or other officer in charge of a vessel in a foreign port. It then only remains to inquire whether the other alternative ought to have been adopted — that is, that the ship should have been allowed to remain in the port of distress, until communication could be held with her owners, and funds and means be obtained from them to repair and refit the ship, and to put her in all respects in a condition suitable for a resumption of her voyage. If nothing had been wanting to effect this but the necessary funds, and the ship had been engaged in the ordinary business of commerce, there would be great force in the argument that a case for an abandonment had not been made out. But such was not the fact. The ship was bound on a whaling voyage, in which it was essential, not only that she should go to the various whaling grounds in due season, but the character of the master and other officers as well as of the men, their skill and experience in the business, are

absolutely essential to the prosecution of the voyage.   Unless
these could be procured and sent to the port of necessity within a
reasonable time and at a reasonable cost, the injury caused by
the peril insured against could not be made good or the ship be
put in a suitable condition to resume her voyage.   We have
then a case in which it would have been competent for the jury
to find that the vessel, being bound on a whaling voyage, was in
a port of distress in a distant quarter of the globe; that she was
there in charge of the mate who was not competent to take com-
mand, and who was without funds or the means of procuring
any ; that she had been deprived of officers and crew of suffi-
cient capacity, skill and experience to render her navigable for
the voyage ; that these could not be replaced unless persons
competent for the duty could be procured by communicating
with the owners, and this only after the lapse of many months
and at a heavy expense ; nor could he be certain that the defi-
ciency in officers and men could be so supplied.   Under such cir-
cumstances, it seems to us that a verdict for a constructive total
loss would not be so perverse as to make it the duty of the court
to set it aside.   These facts make out a much stronger case for
an abandonment than is said to be requisite in a leading case in
England, where, after the vessel had been abandoned at sea by
the. officers and crew, and subsequently brought into port and
repaired and sent home, it was said by the court that the mere
existence of the ship after a total loss and abandonment will
not reduce it to a partial loss.   The ship must be *in esse* in the
country of the owner, under such circumstances that he may if
he pleases take possession of her, and may reasonably be ex-
pected to do so.   *Holdsworth* v. *Wise,* 7 B. & C. 794, and 1 Man.
& Ry. 673.   2 Arnould on Ins. 1072.   It is not necessary for the
decision of this case, that we should go to the extent of sanc-
tioning the correctness of this statement as an absolute proposi-
tion.   But it warrants us in saying that when a total loss has
once accrued, an owner is not bound to take back the vessel, if
the circumstances of the restitution are such that he may not
reasonably be expected to do so.   In the case at bar, we are of
opinion that the facts in proof might have led a jury to infer

that a prudent owner, if insured, would have abandoned the voyage and sold the vessel and outfits at the port of distress.

It is hardly necessary to add that the state of facts at the time of the abandonment were not such as to deprive the party of his claim for a constructive total loss. Whether the vessel was sold by the mate at Sydney, or suffered to remain in the dock there, or refitted to come home for the benefit of whom it might concern, it could not make any difference as to the right of the owners to abandon. The voyage had then been broken up and abandoned, in consequence of a peril insured against; she was not in the possession of the owners; but she had been sent home by the consul, acting as agent for those who might eventually be interested in her. *Judgment for a total loss.*