254 F.2d 177
 NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, Pennsylvania, Respondent, Appellant and Cross-Appellee, and Appellee.
v.
The REPUBLIC OF CHINA, China Merchants Steam Navigation Company, Limited, and the United States of America, Libellants, Appellees and Cross-Appellants, and Appellants.
 No. 7550.
 United States Court of Appeals Fourth Circuit.
 Argued January 15, 1958.
 Decided April 8, 1958.
 
 Martin P. Detels, New York City (Lord, Whip & Coughlan, Baltimore, Md., Bigham, Englar, Jones & Houston, New York City, George W. P. Whip, Baltimore, Md., Vincent L. Leibell, Jr., and Joseph J. Magrath, 3rd, New York City, on brief), for Nat. Union Fire Ins. Co. of Pittsburgh.
 Thomas F. McGovern, Atty., Dept. of Justice, Washington, D. C. (George Cochran Doub, Asst. Atty. Gen., Leon H. A. Pierson, U. S. Atty., Baltimore, Md., and Leavenworth Colby, Atty., Dept. of Justice, Washington, D. C., on brief), for U. S.
 Ronald A. Capone, Washington, D. C. (Kirlin, Campbell & Keating, New York City, Ober, Williams, Grimes & Stinson, Baltimore, Md., Robert E. Kline, Jr., Washington, D. C., and William A. Grimes, Baltimore, Md., on brief), for The Republic of China and China Merchants Steam Navigation Co., Ltd.
 Before PARKER, Chief Judge, and SOPER, and HAYNSWORTH, Circuit Judges.
 SOPER, Circuit Judge.
 
 
 1
 These suits in admiralty were brought to recover the value of seven vessels which had been sold by the United States to the Nationalist Government of China and subsequently lost by the defection of their masters, officers or crew to the Communist Government of China. Each vessel is the subject of a separate suit but all of the suits were tried concurrently in the District Court. The libellants are the Republic of China, China Merchants Steam Navigation Company, which operated the ships as a governmental corporation of the Republic of China, and the United States, the holder of purchase money preferred mortgages on the ships. The respondent is the National Union Fire Insurance Company of Pittsburgh, Pennsylvania, which had issued marine policies and war risk policies on each ship to the Government of the Republic of China, insuring it against the loss of the vessel resulting, in addition to other causes, from perils of the seas, barratry of the master and mariners or the consequences of civil war, excepting however, capture and seizure. The principal question in each case is whether the loss of the vessel was caused by barratry, which was covered by the policy, or by capture and seizure, which were excluded from coverage by the policy, or by both.
 
 
 2
 The District Judge filed a carefully considered opinion and exhaustive findings of fact to which reference may be made for detailed information. 151 F. Supp. 211. He held that six of the vessels were lost by barratry of the master and awarded damages to the libellants in the sum of $2,995,270.87, the face amount of the policies, with interest at 3 per cent from the date liability was denied to the date of the decree, and interest at 6 per cent from the latter date until paid. As to the seventh vessel the Judge dismissed the libel since he found that the loss was due to seizure of the ship by the crew which, in his judgment, was excluded from coverage by the terms of the policies. The insurance company has appealed from the adverse judgment as to the six vessels; and the libellants have appealed from the award of interest at 3 per cent to the date of the decree, claiming that they are entitled to 6 per cent for this period, and have also appealed from the judgment dismissing the libel as to the seventh vessel.
 
 
 3
 On various dates in 1946 and 1947, the United States sold to the Government of the Republic of China a number of Liberty ships, including the seven covered by the policies in suit. In each instance the buyer executed and delivered to the United States, represented in some instances by the Maritime Commission and in others by the Export-Import Bank of Washington, a note and a preferred ship mortgage to secure the unpaid balance of the purchase price. Defaults in these mortgages occurred in October 1949, and were declared by the United States on or about January 17, 1950, whereby it acquired the right to retake the vessels.[1]
 
 
 4
 The Republic of China, the named insured in all of the policies, was proclaimed in 1911 and in the middle 1920's established a strong national government at Nanking. Following World War II, Taiwan, which had been surrendered to Japan in 1904, was reincorporated into China as a province. In 1937, the Chinese communist movement actively organized resistance to Japan in northern China. After World War II Communist Armies dominated northern China and in 1949 drove southward so that as of April 19, 1949, a state of civil war existed. The Nationalist Government, under increasing pressure, moved its capital from Nanking to Canton in April, 1949; thence to Chungking and to Chengtu and, finally, to Taipei, Taiwan, on December 9, 1949, by which time the mainland was largely in control of the communist forces. Since that date it has continued to operate on Taiwan as a sovereign entity. It is recognized by the United States as the only proper and lawful government of China and its officials are the accredited representatives of the Republic of China in the United Nations.
 
 
 5
 On October 1, 1949, the Communist Government was proclaimed under the name of the Central People's Government of the People's Republic of China. On October 14, 1949, it occupied Canton, which is close to the port of Hong Kong, a Crown Colony of the United Kingdom. On January 5, 1950, the British Government recognized the Communist Government as the de jure government of China and ceased to recognize the Nationalist Government as a de jure government. A number of other nations extended de jure recognition to the Communist Government.
 
 
 6
 After the ships were acquired they were operated by the Nationalist Government through an agency which, in September, 1948, was organized as a government-owned corporation called the China Merchants Steam Navigation Company, Ltd. The head office of the company was located at Shanghai until May, 1949, when it was transferred to Taipei, Taiwan, with a branch office at Hong Kong. The port of registry of each of the vessels was transferred to a port on Taiwan in the latter part of 1949. The respondent insurance company recognized this government agency as the representative of the Nationalist Government in the operation of the ships and transacted with it the insurance business relating to vessels owned by the Nationalist Government, including the seven vessels in this suit. The insurance company accepted premiums on the policies, which were paid out of the funds of the Republic of China, and recognized the Republic of China as the owner of the fleet which it had insured against loss.
 
 
 7
 The insurance policies covering the seven vessels were issued at various dates in 1949.[2] The named insured in all of the policies is "The Government of the Republic of China represented by Universal Trading Corp." and the loss, if any, was made payable to the United States Maritime Commission, or the Export-Import Bank, for distribution to itself and to the Government of the Republic of China as their interest might appear. The total amounts for which the vessels were insured were: Cheng Kung $470,000; Chiao Jen $470,000; Hung Chang $470,000; Lin Shen $342,375; Teng Keng $372,075; Tsai Er $342,375; Hai Hsuan $550,000. The policies were valued policies.
 
 
 8
 The marine risk policies are in the customary form with a Free of Capture and Seizure clause or warranty added. The terms of these policies with which we are particularly concerned insure against loss of the vessel resulting, in addition to other considerations, from "Barratry of the Master and Mariners and all other like Perils, Losses and Misfortunes," but exclude claims for loss, damage or expenses "resulting from capture, seizure, arrest, restraint or detainment or the consequences thereof or of any attempt thereat, or any taking of the Vessel, by requisition or otherwise; whether in time of peace or war and whether lawful or otherwise; also from all consequences of hostilities or warlike operations * * Further warranted free from the consequences of civil war, revolution, rebellion, insurrection, or civil strife arising therefrom, or piracy."
 
 
 9
 The war risk policies cover the risks, including barratry, which would be covered by the marine risk policy in the absence of the above quoted "free of capture and seizure" exclusionary warranty. Originally the war risk policies did not exclude capture and seizure but contained certain trading warranties, which were modified from time to time, to limit the ports in China at which the ships could touch, so as to avoid the danger of capture by the communists. In June 1949, when the communist armies were rapidly extending their area of conquest, the clause "excluding capture and seizure" was added to the war risk policies, obviously to avoid capture by the communist forces.
 
 
 10
 Against this background we come to consider whether the loss of the vessels under the circumstances set out below should be ascribed to the barratry of the master or crew within the coverage of the policies or to capture and seizure which is excluded therefrom. The relevant findings of fact of the District Judge, which are supported by the evidence, may be summarized as follows:
 
 
 11
 The six vessels first listed above were among thirteen vessels, owned by the Nationalist Government and managed by China Merchants, which were in the port of Hong Kong during November and December, 1949. For convenience the six vessels have been designated as the "Hong Kong vessels" in this opinion.
 
 
 12
 China Merchants maintained its head office, under a general manager, in Taipei and a branch office in Hong Kong where a branch manager and marine superintendent were located. From November 13, 1949 to January 16, 1950, when the communist threat was becoming more and more imminent, the general manager sent many messages to the Hong Kong office and to the officers and crew of the ships ordering the ships to leave Hong Kong and sail for Taiwan or Japan or, in some instances, to the Philippines. These orders were ignored since most of the ships' personnel were reluctant for a number of reasons to go to Taiwan and were inclined to favor the communist regime. These reasons were reported to headquarters, together with a request for additional money for wages and supplies. The necessary money was sent by the Taiwan office to Hong Kong. There were communist agents as well as agents of the Nationalist Government operating both in Hong Kong and on the ships; and on January 13, 1950, the manager and most of the employees of the Hong Kong office publicly defected to the Communist Government. The head office, however, remained completely loyal to the Nationalist Government and there was nothing to prevent the ships from leaving the port except the unwillingness of the master and mariners to obey the orders of the head office. Two ships other than the six did sail to Taiwan. The Communist Government took over all the government property on the mainland that it could reach and its artillery dominated the harbor of Hong Kong; but it did not, by proclamation or otherwise, purport to take over the China Merchants Steam Navigation Company or any ships in foreign ports.
 
 
 13
 The Hong Kong personnel continued to man the Hong Kong office but they displayed the Communist flag and operated for the benefit of the Communist Government; and on January 15 the master of each vessel voluntarily, as a result of an agreement amongst themselves, raised the communist flag in place of the flag of the Nationalist Government. The vessels remained in the port of Hong Kong until September, 1950, when they sailed for Canton. During that period the wages were paid by the Hong Kong office with money supplied by the communist regime. However, while the vessels were at Hong Kong no document or other paper was filed with the government of Hong Kong showing any change in the port of registry, owner or flag of any of the six vessels.
 
 
 14
 The Hai Hsuan, unlike the other six vessels, was on the high seas proceeding easterly through the Indian Ocean bound for Japan at the time of the British recognition of the Communist Government and at the time of the defection of the personnel in the Hong Kong office. The officers and crew of the ship learned of these incidents through British radio broadcasts. The master received orders by radio from the head office at Taiwan not to stop at any British port and to proceed at all possible speed to Taiwan. He was anxious to comply but the crew objected, first arguing through the officers for a stop at Hong Kong then later pressing for Singapore. The master was advised by a member of the crew that the chief engineer was leading a plot against him and trying to convince the other officers and mariners that the ship should be kept from going to Taiwan. A radio dispatch was received from the communist-controlled Hong Kong office to put into Singapore and the officers and crew held a meeting to decide which orders to follow. The master informed the gathering that his orders alone should be obeyed. He decided that the ship should not go to Singapore. But, when the ship was 100 miles west of Singapore, the chief officer threatened to stop the engines if no call was made at that port. The master gave no heed to this statement but on the following day, January 23, when Singapore was thirty miles distant, the engines stopped and the master, several days without food and apparently quite ill, radioed Taiwan that he was sick in bed and requested orders. In reply the head office, unaware of the situation on board the ship, instructed the chief officer to assume command and proceed to Taiwan. Instead, he put into Singapore on January 24, and on January 26, after the master had been admitted to a hospital on shore, having left behind all papers, log books and radio messages, the communist flag was raised over the vessel. The wages of the crew were thereafter paid by the communists in control of the Hong Kong office. On February 1, China Merchants instructed Paul H. Paulsen, master mariner, to take command of the vessel in Singapore. Unable to get police protection from the harbor authorities, he mustered a skeleton crew and, unarmed, boarded the ship. Upon request that the ship be turned over, the Chinese crew voted a refusal and grew belligerent. Captain Paulsen then abandoned the venture and took his men ashore.
 
 
 15
 The crucial question is whether under these circumstances the activities of the masters of the Hong Kong vessels and of the crew of the Hai Hsuan amounted to barratry. The following excerpt from the opinion of Judge Thomsen in the District Court sets out the generally accepted definition of the offense of barratry with the supporting authorities [151 F.Supp. 226]:
 
 
 16
 "The classic definition of barratry was given by Lord Ellenborough, C. J., in Earle v. Rowcroft, 8 East 126, at 138: `* * * a fraudulent breach of duty by the master, in respect to his owners; or, in other words, a breach of duty in respect to his owners, with a criminal intent, or ex maleficio, is barratry. And with respect to the owner of the ship or goods, whose interest is to be protected by the policy, it can make no difference in the reason of the thing, whether the prejudice he suffers be owing to an act of the master, induced by motives of advantage to himself, malice to the owner, or a disregard to those laws which it was the master's duty to obey, and which (or it would not be barratry) his owners relied upon his observing.' The English Marine Insurance Act, 1906, Sch. I, Rule 11, provides: `The term "barratry" includes every wrongful act wilfully committed by the master or crew to the prejudice of the owner, or, as the case may be, the charterer.' This definition is accepted in America as well as in England. Arnould, sec. 839; 1 Phillips on Insurance (5th ed., N.Y., 1867), sec. 1062; Patapsco Ins. Co. v. Coulter, 3 Pet. 222, 28 U.S. 222, 7 L.Ed. 659; Greene v. Pacific Mutual Ins. Co., 9 Allen 217, 91 Mass. 217. Wilful nonfeasance of the master, doing nothing, if productive of mischief to the owner, may be barratry. Patapsco Ins. Co. v. Coulter, supra. If the captain deviates, or is compelled by the crew to deviate the vessel from its proper course and to put into an unauthorized port in fraud of his or their duty to owners, it is barratry. So is unreasonable or criminal delay. Arnould, secs. 844, 847. Where a captain, acting in collusion with the captain of an enemy ship, sailed his vessel to an area where she was captured by the enemy ship, it was held that recovery might be had either on the ground of barratry or of capture. Arcangelo v. Thompson, 2 Camp. 620. Crime is not a necessary element of barratry. Arnould, sec. 845, 847. Mutiny of mariners is discussed in Arnould, sec. 848, which says that `where the crew overpower the captain or constrain him to consent to their proceedings, the same acts would be barratry in them as in the master.'"
 
 
 17
 The celebrated and widely cited opinion of Chief Justice Bigelow in Greene v. Pacific Mutual Life Ins. Co., 1864, 9 Allen 217, 91 Mass. 217, applied these principles to a case in which the owner of a whaling ship recovered from the insurance company for a loss sustained when the ship was taken from the command of the officers and the possession of the owner by a mutinous crew. The master and third officer were killed, the first and second officers were badly wounded and the ship and its equipment were so badly damaged that the voyage was necessarily abandoned. The principal question considered by the court was whether the insurance company was liable for the loss under the clause covering "barratry of master or mariners" or was exonerated under the clause by which the vessel was warranted "free from loss or expense arising from capture, seizure or detention". The company defended on the ground that the evidence showed a "seizure" of the vessel by the mutinous acts of the crew. In discussing this question, the Court said, 9 Allen at page 220, 91 Mass. at page 220:
 
 
 18
 "* * * Barratry is one of the enumerated perils against which the defendants insured the plaintiff. This is a generic term which includes many acts of various kinds and degrees. It comprehends any unlawful, fraudulent or dishonest act of the master or mariners, and every violation of duty by them arising from gross and culpable negligence contrary to their duty to the owner of the vessel and which might work loss or injury to him in the course of the voyage insured. A mutiny of the crew and forcible dispossession by them of the master and other officers from the ship is only one form of barratry. Now it is obvious, in a practical point of view that no reasons existed for exempting this particular mode of committing the act from the general risk of barratry which the underwriters assumed. There was nothing in the nature of the voyage, or the business in which the ship was to engage, which furnished occasion for such exception. Nor is it reasonable to suppose that the parties, if they contemplated such a special warranty against a particular form or mode of committing an act of barratry, would have expressed it in language which, as applied to the subject matter, leaves this meaning, to say the least, exceedingly doubtful and ambiguous. This consideration is of itself quite decisive of the construction which it is our duty to put on the policy declared on. Inasmuch as barratry is one of the risks assumed by the assured, unless particular acts are clearly excepted in terms which leave no doubt as to their meaning, the general words of the policy must have full operation. 1 Phil. Ins. § 1163. Lawrence v. Aberdein, 5 B. & Ald. 107.
 
 
 19
 "But we do not deem it necessary to put the decision of this point on so narrow a ground. Upon careful consideration, we are of opinion that the exception of a loss by seizure does not include the risk of mutiny of the mariners and the forcible taking of the ship from the control of the officers; or, in other words, that it does not properly exclude from the operation of the policy a loss by barratry. Certainly the word `seizure' cannot be applied to any barratrous act of the master. He has by law possession and control of the ship. He may, it is true, take her out of her course, or convert her to his own use in violation of his duty to the owners. But he cannot be justly said to seize that which is already in his own keeping. The same is true to a certain extent of the mariners. While in the discharge of their duty they have a qualified possession of the vessel. Subject to the order of the master, it is in their care and custody. If they violate their duty and disobey the master, displace him from command and assume entire control of the vessel, it is a breach of trust rather than a seizure. Lawton v. Sun [Mutual] Ins. Co., 2 Cush. 500, 514. It can be properly described only as barratry, in like manner as misappropriation of money by a servant or agent to whom it is intrusted is, correctly speaking, embezzlement, and not larceny. Indeed, the word `seizure,' as applied to the contract of insurance, may be said to import the taking possession of a ship or vessel by superior force, or by violence from without, and not a barratrous conversion of her by the officers and crew, or either of them. No adjudicated case can be found in which it has been interpreted to include an act of the latter character. The recent case of Kleinwort v. Shepard, 1 El. & El. 447, cited by the defendants' counsel, is authority only for the position that a forcible dispossession of the master and mariners by passengers acting mutinously might properly be deemed a seizure. We are not prepared to say that the conclusion arrived at by the court in that case was a sound one. But it differs essentially from the case at bar in the leading fact that the ship was there forcibly taken possession of by persons who were incapable of committing an act of barratry, because they had no care or custody of the ship, and stood in no relation of trust towards the owners. There was some ground, therefore, for regarding the mutinous act of the passengers as violence from without, and so within the warranty which exempted the insurers from loss by seizure. That the word was not intended to be used in any broader sense, in the policy declared on, so as to embrace the barratrous acts of the crew, is manifest from the connection in which it stands in the warranty. The exemption is from liability for loss by reason of capture, seizure or detention. Capture and detention are both risks which can arise only from acts of persons having no connection with the ship, who take her out of the possession of the master and mariners forcibly, either without right or by the authority of law. The rule of interpretation, that words coupled together in the same sentence are to be understood and construed in eodem sensu, warrants the conclusion that `seizure' was intended to be understood as having reference to a similar class of risks, and to exempt the insurers from liability to loss arising from a forcible taking of the vessel by others than the officers or crew.
 
 
 20
 "Authority is not wanting for the position that `seizure,' in a contract of insurance, is always to be understood in a restricted and limited sense, as signifying only the taking of a ship by the act of governments or other public authority for a violation of the laws of trade, or some rule or regulation instituted as a matter of municipal policy, or in consequence of an existing state of war. It is so understood in the commercial code of continental Europe. In this sense, too, it is used in other clauses of the policy declared on which exempt the underwriters from liability for `seizure for or on account of illicit or prohibited trade, or trade in articles contraband of war.' Such undoubtedly is its most common and ordinary signification, as applied to the subject matter of marine insurance. Whether it can have a broader meaning, so as to include a forcible taking of a ship as an act of hostility or for the purpose of plunder, it is not necessary now to determine. It is sufficient for the decision of the present case to say, that it cannot be interpreted to include the dispossession of the master and other officers from the ship by the mariners, and the barratrous conversion of her by them to their own use."
 
 
 21
 This decision has been repeatedly cited and the principles enunciated have been generally accepted by text writers on the subject of marine insurance. See 1 Phillips, Insurance, 5th ed., 1867, p. 652; 1 Parsons, Law of Marine Insurance, 584; Richards on Insurance, 4th ed., 1924, p. 834; 5 Appleman, Insurance Law and Practice, 1941, § 3256, note 37; and so it has become familiar knowledge to underwriters of marine insurance and their technical advisers, as pointed out in the opinion of the District Court, that according to recognized authority the term "seizure" does not include a violent taking of possession of the ship by a mutinous crew.
 
 
 22
 In this view of the law, which we accept, the liability of the insurance company not only for the loss of the six Hong Kong ships but also for the loss of the Hai Hsuan is established. We are unable to accept the conclusion of the District Judge that the insurance company has no liability for the loss of the Hai Hsuan, a conclusion which is based on the stated distinction between the "possession and control" of the ship by the master and the "qualified possession" of the crew. Undoubtedly the possession of the crew is subject to the paramount authority of the master but they are not relieved from their own obligation to the owner when for any reason the master is unable to carry on. Clearly the crew cannot rid themselves of this duty of obedience to the owner by forcibly taking the controlling possession of the vessel out of the hands of the master. On the contrary, their duty becomes the greater when they depose the master and arrogate the supreme authority to themselves. As Chief Justice Bigelow said in the Greene case: "If they violate their duty and disobey the master, displace him from command and assume entire control of the vessel, it is a breach of trust rather than a seizure."
 
 
 23
 No case has come to our attention in which the barratrous conduct of either the master or the crew of a vessel has been held to be within the capture and seizure exclusion clause of a marine insurance policy.
 
 
 24
 In Kleinwort v. Shepard, 1 El. & El. 447, 120 Eng.Rep. 977 (1859), coolie passengers took control of a ship and made off with her. The court, in holding that the resulting loss came within the exclusion of "capture and seizure," inquired argumentatively whether it would not also be a seizure if a crew, intending to turn pirates, should murder the captain and run away with the ship. But this was mere dictum, aimed at answering the argument of counsel for the assured that "seizure" within the warranty had to be belligerent and come from without. The single point decided was that the passengers on board the ship, owing no duty of loyalty to the owner and being incapable of committing barratry, had effected a "seizure" of the vessel within the excluding clause. There was no barratry of master or mariners in the case.
 
 
 25
 The closest case in the view of the respondent insurance company is The Minden [1942] A.C. 50, which considered the action of a German master of a German vessel carrying British cargo at the beginning of World War II. Acting under orders of the German Government the master scuttled the ship to prevent her capture by the British. The British court held that the insurance company was liable under a cargo policy insuring against loss by "capture, seizure, arrest, restraint * * * and detainment of all kings, princes, and peoples." The respondent contends that the opinion of Lord Wright, characterizing the action of the German master as a "seizure" of the British cargo, is unassailable authority for the proposition that a person in qualified possession of a thing, such as a master in charge of a ship, can "seize" it from the owner by merely changing the character of his possession. The decision, however, does not justify this conclusion since it was directed to the relationship of the master to the owner of the cargo which differs from his relationship of trust to the owner of the ship in that a breach of the latter amounts to a barratrous act within the coverage of the policy. There was no barratry in the case of The Minden.
 
 
 26
 The respondent also relies on the decision in Cory v. Burr, 8 App.Cas. 393 (1883). In that case the captain of a ship, disregarding his obligation to the owners in order to serve his own ends, used the vessel in smuggling transactions, and while she was stopped at sea in order to transship the smuggled goods she was taken by a Spanish revenue cutter. It was held that the loss was caused not by the barratry of the master but by the seizure of the ship by the Spanish Government. This holding distinguishes the decision from the instant case where it has been found that the barratrous acts constituted the ultimate and efficient cause of the loss of the Hong Kong ships, since it was brought about by the voluntary acts of the masters and crews in possession and was not compelled by the superior forces of the Communist Government. This is the more clear in the case of the Hai Hsuan since the defection of her crew began on the high seas beyond any possible reach of the communist forces.
 
 
 27
 The respondent's defense, however, is not based alone upon the exception of seizure from the coverage of the policy. Another major contention, which goes to the heart of the case is based upon the proposition that the acts of the masters and crews were not barratrous since they did not constitute a breach of duty to the owners of the ships. The argument rests on the doctrine approved in Guaranty Trust Co. v. United States, 304 U.S. 126, 127, 58 S.Ct. 785, 82 L.Ed. 1224,[3] that the rights of a foreign state are vested in the national entity, which is the state, rather than in any particular government which may purport to represent it. With this rule in mind it is contended that title to the ships was not vested in the Nationalist Government of China but in the Chinese state and was not lost by it when the ships were turned over to the Communist Government in January in the port of the British colony of Hong Kong, because at that time and place the Communist Government was recognized by the British Government as the de jure government of China.
 
 
 28
 In the United States and in Great Britain it is established that the courts of the country must accept the action of the executive branch of their nation in recognizing the existence and authority of the government of a foreign state; and this action is binding upon the courts in resolving controversies between rival government factions, each claiming the right to represent a foreign state and to take possession of its property. United States v. Pink, 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796; The Maret, 3 Cir., 145 F.2d 431, 439; The Rogdai, supra, Haile Selassie v. Cable & Wireless, Ltd., supra.[4]
 
 
 29
 If we were confronted in the instant case with a claim of the Communist Government of China to property of the Chinese state in the possession of the Nationalist Government in the United States, we would be obliged to decide in favor of the latter despite the recognition by Great Britain of the former when its armed forces were in control of the area surrounding the Crown Colony of Hong Kong. That, however, is not the case before us. We are asked to give effect to contracts of insurance issued to the Nationalist Government when it was in control of large areas of the Chinese mainland and was engaged in a civil war for supremacy with the communist forces. That government, although now driven from the mainland, is still in existence and is in complete control of the island of Taiwan and its inhabitants and is still recognized by the United States and other nations as the true representative of the Chinese state. It is obvious that no flat of the British Government promulgated in the interest of its colonial possessions in the Chinese area can alter these facts or nullify the actual existence of a government which is functioning as an independent nation.
 
 
 30
 The correct approach to the problem is set out in the following passage from the opinion of the District Judge dealing with the effect of Great Britain's recognition of Communist China:
 
 
 31
 "But the instant suits present a problem which was not involved in those cases. The United States did not sell the ships to the Chinese nation or the Chinese state, but to `the Government of the Republic of China'. That is the government which was and is popularly called the Nationalist Government. The insurer knew this, and wrote its policies accordingly. At the time of the sale a communist regime controlled a large portion of northern China, and claimed to exercise governmental authority over part, at least, of the territory it controlled. On October 1, 1949, the communists proclaimed the Central People's Government (the Communist Government) to be the government of all China. The Government of the Republic of China (the Nationalist Government) continued to function, although it was forced to move several times, finally to Taipei, Taiwan. It is still recognized by the United States as the de jure government of China, and is a member of the United Nations, although the Communist Government was recognized by the British Government as the government of China on January 5, 1950.
 
 
 32
 "With knowledge of these facts, respondents, both before and after October 1, 1949, and after January 5, 1950, issued policies of insurance to the Government of the Republic of China as the named insured and accepted premiums thereon. Respondents are estopped to deny that the ships were owned by the Government of the Republic of China, the Nationalist Government, as distinguished from the sovereign state or national entity, China. Indeed, it is hard to tell what the sovereign state or national entity, China, should be considered to embrace, in view of the history of that country and the existence during all material times of two governments, each controlling part of the territory which was included in the Chinese empire and the Republic of China during most of the last 500 years, including the years since 1945.
 
 
 33
 "But it is not necessary to rest the decision on this point on estoppel. Under United States v. Pink, 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796, this court is bound to accept the political decision of the Department of State that the Nationalist Government is still the de jure government of China. That decision forbids this court to conclude that the Communist Government or any of its agents had the legal right to take over the ships." [151 F.Supp. 228.]
 
 
 34
 The respondents further contend that masters and mariners who change sides in a civil war and take their ships with them cannot be considered to have committed barratry. The answer to this is simply that the characterization of an act as barratrous is independent of the motives which provoked the act. Barratry cannot be modified by patriotism. In The Jupiter No. 3, [1927] Prob. 122, the master who had been placed in command of a vessel by the administrator for White Russian interests allowed the U.S.S.R. to gain possession of his ship. The court decided that the master "may have acted as a loyal subject of the U.S. S.R., but he betrayed his trust to his employers."
 
 
 35
 We find no error in the allowance by the District Judge of interest at 3 per cent on the face amount of the policies from the date of the rejection of the claims by the insurance company to the date of the decree and interest at 6 per cent thereafter.
 
 
 36
 The judgment of the District Court in each of the cases relating to the Hong Kong vessels will be affirmed and the judgment in the case relating to the Hai Hsuan will be reversed and the case remanded for further proceedings in accordance with this opinion.
 
 
 37
 This opinion was not submitted to Judge Parker before his death, but the case was considered by him in conference and he concurred in the conclusions reached.
 
 
 38
 Affirmed in part and reversed in part.
 
 
 
 Notes:
 
 
 [1]
 As of December 31, 1956, the balances due on the several notes, with interest, were as follows:
 Total Interest
 Outstanding (3½% to date
 Balance of default declared Total Principal
 Ship Principal 6% thereafter) & Interest

 Eximbank

 Lin Shen $416,100.00 $185,329.80 $601,429.80
 Teng Keng $390,640.00 $173,989.99 $564,629.99
 Tsai Er $390,640.00 $173,989.99 $564,629.99

 Maritime

 Cheng Kung $313,200.00 $138,110.72 $451,310.72
 Chiao Jen $313,200.00 $138,553.75 $451,753.75
 Hung Chang $313,200.00 $137,890.67 $451,090.67
 Hai Hsuan $373,880.00 $165,737.29 $539,537.29
 
 
 [2]
 For example, the Teng Keng was insured for $372,075 under marine policies issued on May 24, 1949, which were in effect during the events hereinafter related and until April 1, 1950, and also war policies which were issued on December 15, 1949, and terminated on January 17, 1950, and other war risk policies issued on the last mentioned date and terminated April 1, 1950
 
 
 [3]
 See also Lehigh Valley R. Co. v. State of Russia, 2 Cir., 21 F.2d 396; The Rogdai, D.C.N.D.Cal., 278 F. 294; Haile Selassie v. Cable & Wireless, Ltd., [1939] 1 Ch. 182
 
 
 [4]
 British courts in the Far East have accepted the recognition of the Communist Government of China by Great Britain in suits prosecuted to secure possession of the Hai Hsuan and other property that had come into the possession of the Communist Government. In United States v. Yang Soon-Ee and Another (The Hai Hsuan), 1 Malayan Law Report 63 (1950), the United States instituted legal proceedings to recover possession of the Hai Hsuan from her officers but the High Court refused to exercise jurisdiction on the ground that the Communist Government had possession of the ship and was entitled to sovereign immunity. In Civil Air Transport, Inc. v. Central Air Transport Corp., [1953] A.C. 70, 2 Lloyd's Rep. 209, the object of the suit brought by an American corporation was to recover possession of airplanes in Hong Kong which had been sold by the Nationalist Government of China to the plaintiff corporation's predecessor in interest in December 1949, prior to British recognition of the Communist Government. The validity of this sale was recognized and the claim of the Communist Government to the property was denied by the court since it was shown that the Communist Government had not taken possession of the property and the subsequent recognition was held not to operate retroactively to extinguish the title of the purchaser