HON. STANLEY STEINGUT Speaker, New York State Assembly
This is in response to the letter of October 8, 1976 issued on your behalf by the Office of Legislative Oversight and Analysis which requests my opinion as to whether Chapter 662 of the New York Laws of 1975 (commonly referred to as the "Lisa Law" or "Arab Boycott Law") covers banks and letters of credit transactions.
Chapter 662 of the Laws of 1975, which became effective on January 1, 1976, amended the New York Human Rights Law by adding subd. 13 to § 296 of the Executive Law. Section 296, subd. 13 provides:
 "It shall be an unlawful discriminatory practice (i) for any person to discriminate against, boycott or blacklist, or to refuse to buy from, sell to or trade with, any person, because of the race, creed, color, national origin or sex of such person, or of such person's partners, members, stockholders, directors, officers, managers, superintendents, agents, employees, business associates, suppliers or customers, or (ii) for any person wilfully to do any act or refrain from doing any act which enables any such person to take such action. This subdivision shall not apply to:
(a) Boycotts connected with labor disputes; or
 (b) Boycotts to protest unlawful discriminatory practices."
The term "person" as used in the statute is defined in § 292(1) of the Executive Law to include ". . . one or more individuals, partnerships, associations, corporations, legal representatives, trustees, trustees in bankruptcy, or receivers." Neither § 292(1), nor any other section of the Human Rights Law, contains any language from which it could be inferred that banks are excluded from the purview of the Human Rights Law. Indeed, we have been advised by counsel to the State Division of Human Rights that although numerous complaints have been instituted against banks based on claims of discrimination under various provisions of the Human Rights Law, none of the banks has ever challenged the application of the Human Rights Law to their activities.
A letter of credit is defined in the New York Uniform Commercial Code as ". . . An engagement by a bank or other person made at the request of a customer . . . that the issuer will honor drafts or other demands for payments upon compliance with the conditions specified in the credit . . .". New York Uniform Commercial Code, § 5-103(1)(a).
Although Chapter 662 does not specifically mention "letters of credit", the type of conduct prohibited by Executive Law § 296
subd. 13 would clearly encompass a letter of credit transaction which included conditions that required the issuer to comply with the boycott. It might also be noted that the issuer of a letter of credit who agrees to honor the terms of a boycott of the type that is prohibited by Executive Law § 296 subd. 13 might also be engaging in conduct in violation of Executive Law § 296 subd. 6 which prohibits ". . . any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so."
The legislative history of Chapter 662 indicates that the intention of the Legislature was to include banks and letters of credit transactions within its purview.
During the debate on Assembly Bill No. 7640-A, which became Chapter 662 of the Laws of 1975, the bill's sponsors, Assemblymen Lisa and Blumenthal both referred to banks as being included within the coverage of the bill (Record of Assembly Proceedings, May 15, 1975, p. 4956; June 4, 1975, p. 6115). Also, on April 30, 1975, the Acting Superintendent of the New York State Banking Department wrote to the legislative counsel to the Speaker of the Assembly in response to a ". . . request for an illustrative copy of a letter of credit requiring a boycott certificate . . . ". The letter indicated that it was being sent ". . . on the understanding that the purpose for which it will be used is to facilitate the preparation and drafting of legislation dealing with the boycott question." (Letter from Acting Superintendent Ernest Kohn to Edward Margolies, April 30, 1975).
The fact that banking activities may involve interstate or foreign commerce does not operate to bar the application of a state anti-discrimination law. See Colorado Anti-DiscriminationCommission v. Continental Airlines, Inc., 372 U.S. 714 (1963). Nor would the fact that a request to accede to the Arab boycott stems from a foreign government limit the applicability of the State statute under consideration. Cf. Matter of American JewishCongress v. Carter, 23 Misc.2d 446 (Sup.Ct., N.Y. Co., 1959), modified on other grounds 10 A.D.2d 833 (1st Dept., 1960), aff'd 9 N.Y.2d 223 (1961).
Since Chapter 662 is consistent with Federal policy and does not contravene any Federal treaty, no constitutional question of the type at issue in United States v. Pink, 315 U.S. 203 (1942) need be considered.
With respect to Federal policy, the Export Administration Act of 1969, as amended (50 U.S.C. App. §§ 2401-2413) states at § 2402(5):
 "It is the policy of the United States (A) to oppose restrictive trade practices or boycotts fostered or imposed by foreign countries against other countries friendly to the United States, (B) to encourage and request domestic concerns engaged in the export of articles, materials, supplies, or information, to refuse to take any action, including the furnishing of information or the signing of agreements, which has the effect of furthering or supporting the restrictive trade practices or boycotts fostered or imposed by any foreign country against another country friendly to the United States . . ."
Under the rules and regulations issued by the Secretary of Commerce under the authority of the Act, published in Title 15, Chapter III, subchapter B, Part 369 of the Code of Federal Regulations, banking agreements are expressly covered. Section 369.2(a) of the Regulations of the Secretary of Commerce provides:
 "All exporters and related service organizations (including, but not limited to, banks, insurers, freight forwarders, and shipping companies) engaged or involved in the export or negotiations leading towards the export from the United States of commodities, services, or information, including technical data (whether directly or through distributors, dealers, or agents), are prohibited from taking any action, including the furnishing of information or the signing of agreements, that has the effect of furthering or supporting a restrictive trade practice fostered or imposed by foreign countries against other countries friendly to the United States, which practice discriminates, or has the effect of discriminating, against U.S. citizens or firms on the basis of race, color, religion, sex, or national origin."
Upon termination of the Export Administration Act on September 30, 1976, President Ford issued Executive Order No. 11940 which continues in full force and effect all rules and regulations issued by the Secretary of Commerce under the Act.
Chapter 662 is also in conformity with the policy set forth by the Federal Reserve Board, which, in a directive issued on December 12, 1975, stated:
 "The participation of a United States bank, even passively, in efforts by foreign nationals to effect boycotts against other foreign countries friendly to the United States — particularly where such boycott efforts may cause discrimination against United States citizens or businesses — is, in the Board's view, a misuse of the privileges and benefits conferred on banking institutions.
 The Board also notes that the agreement by a United States bank to observe such discriminatory conditions in a letter may constitute a direct violation of federal antitrust laws or of applicable state anti-boycott laws."
In view of the above, I, therefore, conclude that the anti-boycott provisions of Chapter 662 of the New York Laws of 1975 apply to banks and letters of credit.